# FLORIDA v. ROYER

No. 80–2146.  Argued October 12, 1982—Decided March 23, 1983

JUSTICE WHITE, joined by JUSTICE MARSHALL, JUSTICE POWELL, and JUSTICE STEVENS, concluded that respondent was being illegally detained when he consented to the search of his luggage and that such con-

sent was tainted by the illegality and hence was ineffective to justify the search.  Pp. 497–508.

(a) When the detectives identified themselves as narcotics agents, told respondent he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his airline ticket and driver's license and without indicating in any way that he was free to depart, respondent was effectively seized for purposes of the Fourth Amendment.  At the time respondent produced the key to his suitcase, the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity.  What had begun as a consensual inquiry in a public place escalated into an investigatory procedure in a police interrogation room, and respondent, as a practical matter, was under arrest at that time.  Moreover, the detectives' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases.  Pp. 501–507.

(b) Probable cause to arrest respondent did not exist at the time he consented to the search of his luggage.  P. 507.

JUSTICE BRENNAN, concurring in the result, agreed that at some point after the initial stop the officers' seizure of the respondent matured into an arrest unsupported by probable cause.  The respondent's consent to the search of his suitcases, therefore, was tainted by the illegal arrest.  P. 509.

WHITE, J., announced the judgment of the Court and delivered an opinion, in which MARSHALL, POWELL, and STEVENS, JJ., joined.  POWELL, J., filed a concurring opinion, *post*, p. 508.  BRENNAN, J., filed an opinion concurring in the result, *post*, p. 509.  BLACKMUN, J., filed a dissenting opinion, *post*, p. 513.  REHNQUIST, J., filed a dissenting opinion, in which BURGER, C. J., and O'CONNOR, J., joined, *post* p. 519.

*Calvin L. Fox*, Assistant Attorney General of Florida, argued the cause for petitioner.  With him on the briefs was *Jim Smith*, Attorney General.

*Deputy Solicitor General Frey* argued the cause for the United States as *amicus curiae* urging reversal.  With him on the brief were *Solicitor General Lee, Assistant Attorney General Jensen, Joshua I. Schwartz*, and *Deborah Watson*.

*Theodore Klein* argued the cause for respondent.  With him on the brief was *Irwin J. Block*.*

---

*\*Fred E. Inbau, Wayne W. Schmidt, James P. Manak, Robert K. Corbin*, Attorney General of Arizona, and *Steven J. Twist*, Chief Assistant

JUSTICE WHITE announced the judgment of the Court and delivered an opinion, in which JUSTICE MARSHALL, JUSTICE POWELL, and JUSTICE STEVENS joined.

We are required in this case to determine whether the Court of Appeal of Florida, Third District, properly applied the precepts of the Fourth Amendment in holding that respondent Royer was being illegally detained at the time of his purported consent to a search of his luggage.

I

On January 3, 1978, Royer was observed at Miami International Airport by two plainclothes detectives of the Dade County, Fla., Public Safety Department assigned to the county's Organized Crime Bureau, Narcotics Investigation Section.[1] Detectives Johnson and Magdalena believed that Royer's appearance, mannerisms, luggage, and actions fit the so-called "drug courier profile."[2] Royer, apparently unaware of the attention he had attracted, purchased a one-way ticket to New York City and checked his two suitcases, placing on each suitcase an identification tag bearing the name "Holt" and the destination "La Guardia." As Royer made

---

Attorney General, filed a brief for Americans for Effective Law Enforcement, Inc., et al., as *amici curiae* urging reversal.

[1] The facts set forth in this opinion are taken from the en banc decision of the Florida District Court of Appeal, Third District, 389 So. 2d 1007, 1015–1018 (1980), and from the transcript of the hearing on the motion to suppress contained in the joint appendix. App. 11A–116A.

[2] The "drug courier profile" is an abstract of characteristics found to be typical of persons transporting illegal drugs. In Royer's case, the detectives attention was attracted by the following facts which were considered to be within the profile: (a) Royer was carrying American Tourister luggage, which appeared to be heavy, (b) he was young, apparently between 25–35, (c) he was casually dressed, (d) he appeared pale and nervous, looking around at other people, (e) he paid for his ticket in cash with a large number of bills, and (f) rather than completing the airline identification tag to be attached to checked baggage, which had space for a name, address, and telephone number, he wrote only a name and the destination. 389 So. 2d, at 1016; App. 27A–40A.

his way to the concourse which led to the airline boarding area, the two detectives approached him, identified themselves as policemen working out of the sheriff's office, and asked if Royer had a "moment" to speak with them; Royer said "Yes."

Upon request, but without oral consent, Royer produced for the detectives his airline ticket and his driver's license. The airline ticket, like the baggage identification tags, bore the name "Holt," while the driver's license carried respondent's correct name, "Royer." When the detectives asked about the discrepancy, Royer explained that a friend had made the reservation in the name of "Holt." Royer became noticeably more nervous during this conversation, whereupon the detectives informed Royer that they were in fact narcotics investigators and that they had reason to suspect him of transporting narcotics.

The detectives did not return his airline ticket and identification but asked Royer to accompany them to a room, approximately 40 feet away, adjacent to the concourse. Royer said nothing in response but went with the officers as he had been asked to do. The room was later described by Detective Johnson as a "large storage closet," located in the stewardesses' lounge and containing a small desk and two chairs. Without Royer's consent or agreement, Detective Johnson, using Royer's baggage check stubs, retrieved the "Holt" luggage from the airline and brought it to the room where respondent and Detective Magdalena were waiting. Royer was asked if he would consent to a search of the suitcases. Without orally responding to this request, Royer produced a key and unlocked one of the suitcases, which one detective then opened without seeking further assent from Royer. Marihuana was found in that suitcase. According to Detective Johnson, Royer stated that he did not know the combination to the lock on the second suitcase. When asked if he objected to the detective opening the second suitcase, Royer said "[n]o, go ahead," and did not object when the de-

tective explained that the suitcase might have to be broken open. The suitcase was pried open by the officers and more marihuana was found. Royer was then told that he was under arrest. Approximately 15 minutes had elapsed from the time the detectives initially approached respondent until his arrest upon the discovery of the contraband.

Prior to his trial for felony possession of marihuana,[3] Royer made a motion to suppress the evidence obtained in the search of the suitcases. The trial court found that Royer's consent to the search was "freely and voluntarily given," and that, regardless of the consent, the warrantless search was reasonable because "the officer doesn't have the time to run out and get a search warrant because the plane is going to take off."[4] Following the denial of the motion to suppress, Royer changed his plea from "not guilty" to *nolo contendere*," specifically reserving the right to appeal the denial of the motion to suppress.[5] Royer was convicted.

The District Court of Appeal, sitting en banc, reversed Royer's conviction.[6] The court held that Royer had been involuntarily confined within the small room without probable cause; that the involuntary detention had exceeded the limited restraint permitted by *Terry* v. *Ohio*, 392 U. S. 1 (1968), at the time his consent to the search was obtained; and that the consent to search was therefore invalid because tainted by the unlawful confinement.[7]

---

[3] Fla. Stat. § 893.13(1)(a)(2) (1975).

[4] App. 114A–116A.

[5] Under Florida law, a plea of *nolo contendere* is equivalent to a plea of guilty.

[6] On appeal, a panel of the District Court of Appeal of Florida found that viewing the totality of the circumstances, the finding of consent by the trial court was supported by clear and convincing evidence. 389 So. 2d 1007 (1979). The panel decision was vacated and rehearing en banc granted. *Id.*, at 1015 (1980). It is the decision of the en banc court that is reviewed here.

[7] The Florida court was also of the opinion that "a mere similarity with the contents of the drug courier profile is insufficient even to constitute the

Several factors led the court to conclude that respondent's confinement was tantamount to arrest. Royer had "found himself in a small enclosed area being confronted by two police officers—a situation which presents an almost classic definition of imprisonment." 389 So. 2d 1007, 1018 (1980). The detectives' statement to Royer that he was suspected of transporting narcotics also bolstered the finding that Royer was "in custody" at the time the consent to search was given. *Ibid.* In addition, the detectives' possession of Royer's airline ticket and their retrieval and possession of his luggage made it clear, in the District Court of Appeal's view, that Royer was not free to leave. *Ibid.*

At the suppression hearing Royer testified that he was under the impression that he was not free to leave the officers' presence. The Florida District Court of Appeal found that this apprehension "was much more than a well-justified subjective belief," for the State had conceded at oral argument before that court that "the officers would not have permitted Royer to leave the room even if he had erroneously thought he could." *Ibid.* The nomenclature used to describe Royer's confinement, the court found, was unimportant because under *Dunaway* v. *New York,* 442 U. S. 200 (1979), "a police confinement which . . . goes beyond the limited restraint of a *Terry* investigatory stop may be constitutionally justified only by probable cause." 389 So. 2d, at 1019 (footnote omitted). Detective Johnson, who conducted the search, had specifically stated at the suppression hearing that he did not have probable cause to arrest Royer until the suitcases were opened and their contents revealed.

---

articulable suspicion required to justify" the stop authorized by *Terry* v. *Ohio.* It went on to hold that even if it followed a contrary rule, or even if articulable suspicion occurred at some point prior to Royer's consent to search, the facts did not amount to probable cause that would justify the restraint imposed on Royer. 389 So. 2d, at 1019. As will become clear, we disagree on the reasonable-suspicion issue but do concur that probable cause to arrest was lacking.

*Ibid.* In the absence of probable cause, the court concluded, Royer's consent to search, given only after he had been unlawfully confined, was ineffective to justify the search. *Ibid.* Because there was no proof at all that a "break in the chain of illegality" had occurred, the court found that Royer's consent was invalid as a matter of law. *Id.*, at 1020. We granted the State's petition for certiorari, 454 U. S. 1079 (1981), and now affirm.

## II

Some preliminary observations are in order. First, it is unquestioned that without a warrant to search Royer's luggage and in the absence of probable cause and exigent circumstances, the validity of the search depended on Royer's purported consent. Neither is it disputed that where the validity of a search rests on consent, the State has the burden of proving that the necessary consent was obtained and that it was freely and voluntarily given, a burden that is not satisfied by showing a mere submission to a claim of lawful authority. *Lo-Ji Sales, Inc.* v. *New York*, 442 U. S. 319, 329 (1979); *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 233–234 (1973); *Bumper* v. *North Carolina*, 391 U. S. 543, 548–549 (1968); *Johnson* v. *United States*, 333 U. S. 10, 13 (1948); *Amos* v. *United States*, 255 U. S. 313, 317 (1921).

Second, law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, by putting questions to him if the person is willing to listen, or by offering in evidence in a criminal prosecution his voluntary answers to such questions. See *Dunaway* v. *New York*, *supra*, at 210, n. 12; *Terry* v. *Ohio*, 392 U. S., at 31, 32–33 (Harlan, J., concurring); *id.*, at 34 (WHITE, J., concurring). Nor would the fact that the officer identifies himself as a police officer, without more, convert the encounter into a seizure requiring some level of objective justification. *United States* v. *Mendenhall*, 446 U. S. 544, 555 (1980) (opinion of Stewart, J.). The person

approached, however, need not answer any question put to him; indeed, he may decline to listen to the questions at all and may go on his way. *Terry* v. *Ohio*, 392 U. S., at 32–33 (Harlan, J., concurring); *id.*, at 34 (WHITE, J., concurring). He may not be detained even momentarily without reasonable, objective grounds for doing so; and his refusal to listen or answer does not, without more, furnish those grounds. *United States* v. *Mendenhall, supra,* at 556 (opinion of Stewart, J.). If there is no detention—no seizure within the meaning of the Fourth Amendment—then no constitutional rights have been infringed.

Third, it is also clear that not all seizures of the person must be justified by probable cause to arrest for a crime. Prior to *Terry* v. *Ohio, supra,* any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause. *Dunaway* v. *New York, supra,* at 207–209. *Terry* created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime. In that case, a stop and a frisk for weapons were found unexceptionable. *Adams* v. *Williams,* 407 U. S. 143 (1972), applied the same approach in the context of an informant's report that an unnamed individual in a nearby vehicle was carrying narcotics and a gun. Although not expressly authorized in *Terry, United States* v. *Brignoni-Ponce,* 422 U. S. 873, 881–882 (1975), was unequivocal in saying that reasonable suspicion of criminal activity warrants a temporary seizure for the purpose of questioning limited to the purpose of the stop. In *Brignoni-Ponce,* that purpose was to verify or dispel the suspicion that the immigration laws were being violated, a governmental interest that was sufficient to warrant temporary detention for limited questioning. Royer does not suggest, nor do we, that a similar rationale would not warrant temporary detention for questioning on less than probable cause where the public interest

involved is the suppression of illegal transactions in drugs or of any other serious crime.

*Michigan* v. *Summers*, 452 U. S. 692 (1981), involved another circumstance in which a temporary detention on less than probable cause satisfied the ultimate test of reasonableness under the Fourth Amendment. There the occupant of a house was detained while a search warrant for the house was being executed. We held that the warrant made the occupant sufficiently suspect to justify his temporary seizure. The "limited intrusio[n] on the personal security" of the person detained was justified "by such substantial law enforcement interests" that the seizure could be made on articulable suspicion not amounting to probable cause. *Id.*, at 699.

Fourth, *Terry* and its progeny nevertheless created only limited exceptions to the general rule that seizures of the person require probable cause to arrest. Detentions may be "investigative" yet violative of the Fourth Amendment absent probable cause. In the name of investigating a person who is no more than suspected of criminal activity, the police may not carry out a full search of the person or of his automobile or other effects. Nor may the police seek to verify their suspicions by means that approach the conditions of arrest. *Dunaway* v. *New York, supra,* made this clear. There, the suspect was taken to the police station from his home and, without being formally arrested, interrogated for an hour. The resulting incriminating statements were held inadmissible: reasonable suspicion of crime is insufficient to justify custodial interrogation even though the interrogation is investigative. *Id.*, at 211–212. *Brown* v. *Illinois*, 422 U. S. 590 (1975), and *Davis* v. *Mississippi*, 394 U. S. 721 (1969), are to the same effect.

The Fourth Amendment's prohibition against unreasonable searches and seizures has always been interpreted to prevent a search that is not limited to the particularly described "place to be searched, and the persons or things to be seized," U. S. Const., Amdt. 4, even if the search is made pursuant to

a warrant and based upon probable cause. The Amendment's protection is not diluted in those situations where it has been determined that legitimate law enforcement interests justify a warrantless search: the search must be limited in scope to that which is justifed by the particular purposes served by the exception. For example, a warrantless search is permissible incident to a lawful arrest because of legitimate concerns for the safety of the officer and to prevent the destruction of evidence by the arrestee. *E. g., Chimel* v. *California*, 395 U. S. 752, 763 (1969). Nevertheless, such a search is limited to the person of the arrestee and the area immediately within his control. *Id.*, at 762. *Terry* v. *Ohio*, *supra*, also embodies this principle: "The scope of the search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible." 392 U. S., at 19, quoting *Warden* v. *Hayden*, 387 U. S. 294, 310 (1967) (Fortas, J., concurring). The reasonableness requirement of the Fourth Amendment requires no less when the police action is a seizure permitted on less than probable cause because of legitimate law enforcement interests. The scope of the detention must be carefully tailored to its underlying justification.

The predicate permitting seizures on suspicion short of probable cause is that law enforcement interests warrant a limited intrusion on the personal security of the suspect. The scope of the intrusion permitted will vary to some extent with the particular facts and circumstances of each case. This much, however, is clear: an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop. Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time. See, *e. g., United States* v. *Brignoni-Ponce, supra*, at 881–882; *Adams* v. *Williams, supra*, at 146. It is the State's burden to demonstrate that the seizure it seeks to justify on the basis of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions of an investigative seizure.

Fifth, *Dunaway* and *Brown* hold that statements given during a period of illegal detention are inadmissible even though voluntarily given if they are the product of the illegal detention and not the result of an independent act of free will. *Dunaway* v. *New York*, 442 U. S., at 218–219; *Brown* v. *Illinois, supra,* at 601–602. In this respect those cases reiterated one of the principal holdings of *Wong Sun* v. *United States,* 371 U. S. 471 (1963).

Sixth, if the events in this case amounted to no more than a permissible police encounter in a public place or a justifiable *Terry*-type detention, Royer's consent, if voluntary, would have been effective to legalize the search of his two suitcases. Cf. *United States* v. *Watson,* 423 U. S. 411, 424–425 (1976). The Florida District Court of Appeal in the case before us, however, concluded not only that Royer had been seized when he gave his consent to search his luggage but also that the bounds of an investigative stop had been exceeded. In its view the "confinement" in this case went beyond the limited restraint of a *Terry* investigative stop, and Royer's consent was thus tainted by the illegality, a conclusion that required reversal in the absence of probable cause to arrest. The question before us is whether the record warrants that conclusion. We think that it does.

## III

The State proffers three reasons for holding that when Royer consented to the search of his luggage, he was not being illegally detained. First, it is submitted that the entire encounter was consensual and hence Royer was not being held against his will at all. We find this submission untenable. Asking for and examining Royer's ticket and his driver's license were no doubt permissible in themselves, but when the officers identified themselves as narcotics agents, told Royer that he was suspected of transporting narcotics, and asked him to accompany them to the police room, while retaining his ticket and driver's license and without indicating in any way that he was free to depart, Royer was effectively seized for the purposes of the Fourth Amendment.

These circumstances surely amount to a show of official authority such that "a reasonable person would have believed that he was not free to leave." *United States* v. *Mendenhall*, 446 U. S., at 554 (opinion of Stewart, J.) (footnote omitted).

Second, the State submits that if Royer was seized, there existed reasonable, articulable suspicion to justify a temporary detention and that the limits of a *Terry*-type stop were never exceeded.  We agree with the State that when the officers discovered that Royer was traveling under an assumed name, this fact, and the facts already known to the officers— paying cash for a one-way ticket, the mode of checking the two bags, and Royer's appearance and conduct in general— were adequate grounds for suspecting Royer of carrying drugs and for temporarily detaining him and his luggage while they attempted to verify or dispel their suspicions in a manner that did not exceed the limits of an investigative detention.  We also agree that had Royer voluntarily consented to the search of his luggage while he was justifiably being detained on reasonable suspicion, the products of the search would be admissible against him.  We have concluded, however, that at the time Royer produced the key to his suitcase, the detention to which he was then subjected was a more serious intrusion on his personal liberty than is allowable on mere suspicion of criminal activity.

By the time Royer was informed that the officers wished to examine his luggage, he had identified himself when approached by the officers and had attempted to explain the discrepancy between the name shown on his identification and the name under which he had purchased his ticket and identified his luggage.  The officers were not satisfied, for they informed him they were narcotics agents and had reason to believe that he was carrying illegal drugs.  They requested him to accompany them to the police room.  Royer went with them.  He found himself in a small room—a large closet—equipped with a desk and two chairs.  He was alone with two police officers who again told him that they thought

he was carrying narcotics. He also found that the officers, without his consent, had retrieved his checked luggage from the airline. What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions. The officers had Royer's ticket, they had his identification, and they had seized his luggage. Royer was never informed that he was free to board his plane if he so chose, and he reasonably believed that he was being detained. At least as of that moment, any consensual aspects of the encounter had evaporated, and we cannot fault the Florida District Court of Appeal for concluding that *Terry* v. *Ohio* and the cases following it did not justify the restraint to which Royer was then subjected. As a practical matter, Royer was under arrest. Consistent with this conclusion, the State conceded in the Florida courts that Royer would not have been free to leave the interrogation room had he asked to do so.[8] Furthermore, the State's brief in this Court interprets the testimony of the officers at the suppression hearing as indicating that had Royer refused to consent to a search of his luggage, the officers would have held the luggage and sought a warrant to authorize the search. Brief for Petitioner 6.[9]

---

[8] In its brief and at oral argument before this Court, the State contests whether this concession was ever made. We have no basis to question the statement of the Florida court.

[9] Our decision here is consistent with the Court's judgment in *United States* v. *Mendenhall*, 446 U. S. 544 (1980). In *Mendenhall*, the respondent was walking along an airport concourse when she was approached by two federal Drug Enforcement Agency (DEA) officers. As in the present case, the officers asked for Mendenhall's airline ticket and some identification; the names on the ticket and identification did not match. When one of the agents specifically identified himself as attached to the DEA, Mendenhall became visibly shaken and nervous. *Id.*, at 548.

After returning the ticket and identification, one officer asked Mendenhall if she would accompany him to the DEA airport office, 50 feet away, for further questions. Once in the office, Mendenhall was asked to consent

We also think that the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases. First, by returning his ticket and driver's license, and informing him that he was free to go if he so desired, the officers might have obviated any claim that the encounter was anything but a consensual matter from start to finish. Second, there are undoubtedly reasons of safety and security that would justify moving a suspect from one location to another during an investigatory detention, such as from an airport concourse to a more

to a search of her person and her handbag; she was advised of her right to decline. *Ibid.* In a private room following further assurance from Mendenhall that she consented to the search, a policewoman began the search of Mendenhall's person by requesting that Mendenhall disrobe. As she began to undress, Mendenhall removed two concealed packages that appeared to contain heroin and handed them to the policewoman. *Id.*, at 549. The Court of Appeals determined that the initial "stop" of Mendenhall was unlawful because not based upon a reasonable suspicion of criminal activity. In the alternative, the court found that even if the initial stop was permissible, the officer's request that Mendenhall accompany him to the DEA office constituted an arrest without probable cause.

This Court reversed. Two Justices were of the view that the entire encounter was consensual and that no seizure had taken place. Three other Justices assumed that there had been a seizure but would have held that there was reasonable suspicion to warrant it; hence a voluntary consent to search was a valid basis for the search. Thus, the five Justices voting to reverse appeared to agree that Mendenhall was not being illegally detained when she consented to be searched. The four dissenting Justices also assumed that there had been a detention but were of the view that reasonable grounds for suspecting Mendenhall did not exist and concluded that Mendenhall was thus being illegally detained at the time of her consent.

The case before us differs in important respects. Here, Royer's ticket and identification remained in the possession of the officers throughout the encounter; the officers also seized and had possession of his luggage. As a practical matter, Royer could not leave the airport without them. In *Mendenhall*, no luggage was involved, the ticket and identification were immediately returned, and the officers were careful to advise that the suspect could decline to be searched. Here, the officers had seized Royer's luggage and made no effort to advise him that he need not consent to the search.

private area. Cf. *Pennsylvania* v. *Mimms*, 434 U. S. 106, 109–111 (1977) *(per curiam)*. There is no indication in this case that such reasons prompted the officers to transfer the site of the encounter from the concourse to the interrogation room. It appears, rather, that the primary interest of the officers was not in having an extended conversation with Royer but in the contents of his luggage, a matter which the officers did not pursue orally with Royer until after the encounter was relocated to the police room. The record does not reflect any facts which would support a finding that the legitimate law enforcement purposes which justified the detention in the first instance were furthered by removing Royer to the police room prior to the officers' attempt to gain his consent to a search of his luggage. As we have noted, had Royer consented to a search on the spot, the search could have been conducted with Royer present in the area where the bags were retrieved by Detective Johnson and any evidence recovered would have been admissible against him. If the search proved negative, Royer would have been free to go much earlier and with less likelihood of missing his flight, which in itself can be a very serious matter in a variety of circumstances.

Third, the State has not touched on the question whether it would have been feasible to investigate the contents of Royer's bags in a more expeditious way. The courts are not strangers to the use of trained dogs to detect the presence of controlled substances in luggage.[10] There is no indication

---

[10] Courts of Appeals are in disagreement as to whether using a dog to detect drugs in luggage is a search, but no Court of Appeals has held that more than an articulable suspicion is necessary to justify this kind of a warrantless search if indeed it is a search. See, *e. g., United States* v. *Sullivan*, 625 F. 2d 9, 13 (CA4 1980) (no search), cert. denied, 450 U. S. 923 (1981); *United States* v. *Burns*, 624 F. 2d 95, 101 (CA10 1980) (same); *United States* v. *Beale*, 674 F. 2d 1327, 1335 (CA9 1982) (sniff is an intrusion requiring reasonable suspicion), cert. pending, No. 82–674. Furthermore, the law of the Circuit from which this case comes was and is that "use of [drug-detecting canines] constitute[s] neither a search nor a seizure

here that this means was not feasible and available. If it had been used, Royer and his luggage could have been momentarily detained while this investigative procedure was carried out. Indeed, it may be that no detention at all would have been necessary. A negative result would have freed Royer in short order; a positive result would have resulted in his justifiable arrest on probable cause.

We do not suggest that there is a litmus-paper test for distinguishing a consensual encounter from a seizure or for determining when a seizure exceeds the bounds of an investigative stop. Even in the discrete category of airport encounters, there will be endless variations in the facts and circumstances, so much variation that it is unlikely that the courts can reduce to a sentence or a paragraph a rule that will

under the Fourth Amendment." *United States* v. *Goldstein*, 635 F. 2d 356, 361 (CA5), cert. denied, 452 U. S. 962 (1981). See *United States* v. *Viera*, 644 F. 2d 509, 510 (CA5), cert. denied, 454 U. S. 867 (1981). Decisions of the United States Court of Appeals for the Fifth Circuit rendered prior to September 30, 1981, are binding precedent on the United States Court of Appeals for the Eleventh Circuit. *Bonner* v. *City of Prichard*, 661 F. 2d 1206, 1207 (CA11 1981).

In any event, we hold here that the officers had reasonable suspicion to believe that Royer's luggage contained drugs, and we assume that the use of dogs in the investigation would not have entailed any prolonged detention of either Royer or his luggage which may involve other Fourth Amendment concerns. In *United States* v. *Beale, supra,* for example, after briefly questioning two suspects who had checked baggage for a flight from the Fort Lauderdale, Fla., airport, the officers proceeded to the baggage area where a trained dog alerted to one of the checked bags. Meanwhile, the suspects had boarded their plane for California, where their bags were again sniffed by a trained dog and they were arrested. The Court of Appeals for the Ninth Circuit vacated a judgment convicting the suspects on the ground that articulable suspicion was necessary to justify the use of a trained dog to sniff luggage and that the existence or not of that requirement should have been determined in the District Court. 674 F. 2d, at 1335. In the case before us, the officers, with founded suspicion, could have detained Royer for the brief period during which Florida authorities at busy airports seem able to carry out the dog-sniffing procedure.

provide unarguable answers to the question whether there has been an unreasonable search or seizure in violation of the Fourth Amendment. Nevertheless, we must render judgment, and we think that the Florida District Court of Appeal cannot be faulted in concluding that the limits of a *Terry*-stop had been exceeded.

## IV

The State's third and final argument is that Royer was not being illegally held when he gave his consent because there was probable cause to arrest him at that time. Detective Johnson testified at the suppression hearing and the Florida District Court of Appeal held that there was no probable cause to arrest until Royer's bags were opened, but the fact that the officers did not believe there was probable cause and proceeded on a consensual or *Terry*-stop rationale would not foreclose the State from justifying Royer's custody by proving probable cause and hence removing any barrier to relying on Royer's consent to search. *Peters* v. *New York*, decided with *Sibron* v. *New York*, 392 U. S. 40, 66–67 (1968). We agree with the Florida District Court of Appeal, however, that probable cause to arrest Royer did not exist at the time he consented to the search of his luggage. The facts are that a nervous young man with two American Tourister bags paid cash for an airline ticket to a "target city." These facts led to inquiry, which in turn revealed that the ticket had been bought under an assumed name. The proffered explanation did not satisfy the officers. We cannot agree with the State, if this is its position, that every nervous young man paying cash for a ticket to New York City under an assumed name and carrying two heavy American Tourister bags may be arrested and held to answer for a serious felony charge.

## V

Because we affirm the Florida District Court of Appeal's conclusion that Royer was being illegally detained when he consented to the search of his luggage, we agree that the con-

sent was tainted by the illegality and was ineffective to justify the search. The judgment of the Florida District Court of Appeal is accordingly

*Affirmed.*

JUSTICE POWELL, concurring.

I join the plurality opinion. This is an airport "stop for questioning" case similar in its general setting to that before us in *United States* v. *Mendenhall,* 446 U. S. 544 (1980).[1] The plurality opinion today has discussed helpfully the principles applicable to investigative stops for questioning. Since I was the author of one of the opinions in *Mendenhall, id.,* at 560, I write briefly to repeat that the public has a compelling interest in identifying by all lawful means those who traffic in illicit drugs for personal profit. As the plurality opinion emphasizes, *ante,* at 506–507, the facts and circumstances of investigative stops necessarily vary. In view of the extent to which air transportation is used in the drug traffic, the fact that the stop at issue is made by trained officers in an airport warrants special consideration.[2]

This case, however, differs strikingly from *Mendenhall* in the circumstances following the lawful initial questioning and the request that the suspect accompany the officers to a more private place. Royer then found himself in a small, windowless room—described as a "large closet"—alone with two officers who, without his consent, already had obtained possession of his checked luggage. In addition, they had retained his driver's license and airline ticket. Neither the evidence

---

[1] As the plurality notes, *ante,* at 504, n. 9, five Justices in *Mendenhall* were of the view that the respondent in that case had not been illegally detained, and therefore that she had consented to be searched.

[2] Since 1974 the Drug Enforcement Administration has assigned highly skilled agents to the major airports as part of a nationwide program to intercept drug couriers. These agents are guided in part by a "drug courier profile" that identifies characteristics that experience has shown to be relevant in identifying suspects. See *Mendenhall,* 446 U. S., at 562.

in this case nor common sense suggests that Royer was free to walk away. I agree with the plurality that as a practical matter he then was under arrest, and his surrender of the luggage key to the officers cannot be viewed as consensual.

JUSTICE BRENNAN, concurring in the result.

In this case the Florida District Court of Appeal's decision rested on its holding that at some point after the initial stop the officers' seizure of Royer matured into an arrest unsupported by probable cause. 389 So. 2d 1007, 1019 (1980) (en banc). Royer's consent to the search of his suitcases, therefore, was tainted by the illegal arrest. *Id.*, at 1019–1020. The District Court of Appeal's conclusion is amply supported by the record and by our decision in *Dunaway* v. *New York*, 442 U. S. 200 (1979). I therefore concur that the District Court of Appeal's judgment should be affirmed. But the plurality reaches certain issues that it clearly need not reach to support an affirmance.

To the extent that the plurality endorses the legality of the officers' initial stop of Royer, see *post*, at 523, n. 3 (REHNQUIST, J., dissenting), it was wholly unnecessary to reach that question. For even assuming the legality of the initial stop, the plurality correctly holds, and I agree, that the officers' subsequent actions clearly exceeded the permissible bounds of a *Terry* "investigative" stop. *Ante*, at 501, 507. "[A]ny 'exception' that could cover a seizure as intrusive as that in this case would threaten to swallow the general rule that Fourth Amendment seizures are 'reasonable' only if based on probable cause." *Dunaway* v. *New York*, *supra*, at 213. Thus, most of the plurality's discussion of the permissible scope of *Terry* investigative stops is also unnecessary to the decision.

I emphasize that *Terry* v. *Ohio*, 392 U. S. 1 (1968), was a very limited decision that expressly declined to address the "constitutional propriety of an investigative 'seizure' upon less than probable cause for purposes of 'detention' and/or

interrogation." *Id.*, at 19, n. 16. *Terry* simply held that under certain carefully defined circumstances a police officer "is entitled for the protection of himself and others in the area to conduct a carefully limited search of the outer clothing . . . in an attempt to discover weapons which might be used to assault him." *Id.*, at 30. *Adams* v. *Williams*, 407 U. S. 143 (1972), endorsed "brief" investigative stops based on reasonable suspicion, *id.*, at 145–146, but the search for weapons upheld in that case was very limited and was based on *Terry's* safety rationale. 407 U. S., at 146. In *Adams*, we stated that the purpose of the "limited" weapons search was "not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence . . . ." *Ibid.* In *United States* v. *Brignoni-Ponce*, 422 U. S. 873 (1975), we held that "when an officer's observations lead him reasonably to suspect that a particular vehicle may contain aliens who are illegally in the country, he may stop the car briefly and investigate the circumstances that provoke suspicion." *Id.*, at 881. We based this holding on the importance of the governmental interest in stemming the flow of illegal aliens, on the minimal intrusion of a brief stop, and on the absence of practical alternatives for policing the border. *Ibid.* We noted the limited holdings of *Terry* and *Adams* and while authorizing the police to "question the driver and passengers about their citizenship and immigration status, and . . . ask them to explain suspicious circumstances," we expressly stated that "any further detention or search must be based on consent or probable cause." 422 U. S., at 881–882. See also *Dunaway* v. *New York*, *supra*, at 208–212 (discussing the narrow scope of *Terry* and its progeny).

The scope of a *Terry*-type "investigative" stop and any attendant search must be extremely limited or the *Terry* exception would "swallow the general rule that Fourth Amendment seizures [and searches] are 'reasonable' only if based on probable cause." *Dunaway* v. *New York*, *supra*, at 213. In my view, any suggestion that the *Terry* reasonable-suspicion

standard justifies anything but the briefest of detentions or the most limited of searches finds no support in the *Terry* line of cases.*

In any event, I dissent from the plurality's view that the initial stop of Royer was legal. For plainly Royer was "seized" for purposes of the Fourth Amendment when the officers asked him to produce his driver's license and airline ticket. *Terry* stated that "whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person." 392 U. S., at 16. Although I agree that "not all personal intercourse between policemen and citizens involves 'seizures' of persons," *id.*, at 19, n. 16, and that policemen may approach citizens on the street and ask them questions without "seizing" them for purposes of the Fourth Amendment, once an officer has identified himself and asked a traveler for identification and his airline ticket, the traveler has been "seized" within the meaning of the Fourth Amendment. By identifying themselves and asking for Royer's airline ticket and driver's license the officers, as a practical matter, engaged in a "show of authority" and "restrained

---

*I interpret the plurality's requirement that the investigative methods employed pursuant to a *Terry* stop be "the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time," *ante*, at 500, to mean that the availability of a less intrusive means may make an otherwise reasonable stop unreasonable. I do not interpret it to mean that the absence of a less intrusive means can make an otherwise unreasonable stop reasonable.

In addition, contrary to the plurality's apparent suggestion, I am not at all certain that the use of trained narcotics dogs constitutes a less intrusive means of conducting a lawful *Terry* investigative stop. See *ante*, at 505. Such a suggestion finds no support in our cases and any question concerning the use of trained dogs to detect the presence of controlled substances in luggage is clearly not before us.

In any event, the relevance of a least intrusive means requirement within the context of a *Terry* investigative stop is not clear to me. As I have discussed, a lawful stop must be so strictly limited that it is difficult to conceive of a less intrusive means that would be effective to accomplish the purpose of the stop.

[Royer's] liberty." *Ibid.* It is simply wrong to suggest that a traveler feels free to walk away when he has been approached by individuals who have identified themselves as police officers and asked for, and received, his airline ticket and driver's license.

Before *Terry,* only "seizures" of persons based on probable cause were held to satisfy the Fourth Amendment. *Dunaway* v. *New York,* 442 U. S., at 208–209. As we stated in *United States* v. *Brignoni-Ponce, supra,* however, *Terry* and *Adams* "establish that in appropriate circumstances the Fourth Amendment allows a properly limited 'search' or 'seizure' on facts that do not constitute probable cause to arrest or to search for contraband or evidence of crime." 422 U. S., at 881. But to justify such a seizure an officer must have a reasonable suspicion of criminal activity based on "specific and articulable facts . . . [and] rational inferences from those facts . . . ." *Terry* v. *Ohio,* 392 U. S., at 21. See also *Brown* v. *Texas,* 443 U. S. 47, 51 (1979). In this case, the officers decided to approach Royer because he was carrying American Tourister luggage, which appeared to be heavy; he was young; he was casually dressed; he appeared to be pale and nervous and was looking around at other people; he paid for his airline ticket in cash with a large number of bills; and he did not completely fill out the identification tags for his luggage, which was checked to New York. See *ante,* at 493, n. 2. These facts clearly are not sufficient to provide the reasonable suspicion of criminal activity necessary to justify the officers' subsequent seizure of Royer. Indeed, considered individually or collectively, they are perfectly consistent with innocent behavior and cannot possibly give rise to any inference supporting a reasonable suspicion of criminal activity. The officers' seizure of Royer, therefore, was illegal.

Although I recognize that the traffic in illicit drugs is a matter of pressing national concern, that cannot excuse this Court from exercising its unflagging duty to strike down official activity that exceeds the confines of the Constitution.

In discussing the Fourth Amendment in *Coolidge* v. *New Hampshire*, 403 U. S. 443 (1971), Justice Stewart stated: "In times of unrest, whether caused by crime or racial conflict or fear of internal subversion, this basic law and the values that it represents may appear unrealistic or 'extravagant' to some. But the values were those of the authors of our fundamental constitutional concepts." *Id.*, at 455 (plurality opinion). We must not allow our zeal for effective law enforcement to blind us to the peril to our free society that lies in this Court's disregard of the protections afforded by the Fourth Amendment.

JUSTICE BLACKMUN, dissenting.

JUSTICE POWELL, concurring in *United States* v. *Mendenhall*, 446 U. S. 544 (1980), observed:

"The public has a compelling interest in detecting those who would traffic in deadly drugs for personal profit. Few problems affecting the health and welfare of our population, particularly our young, cause greater concern than the escalating use of controlled substances. Much of the drug traffic is highly organized and conducted by sophisticated criminal syndicates. The profits are enormous. And many drugs . . . may be easily concealed. As a result, the obstacles to detection of illegal conduct may be unmatched in any other area of law enforcement." *Id.*, at 561–562.

In my view, the police conduct in this case was minimally intrusive. Given the strength of society's interest in overcoming the extraordinary obstacles to the detection of drug traffickers, such conduct should not be subjected to a requirement of probable cause. Because the Court holds otherwise, I dissent.

I

The Florida District Court of Appeal, Third District, held that respondent Royer had been arrested without probable cause before he consented to the search of his luggage, and that his consent was therefore tainted by this illegal deten-

tion.   I concur in the plurality's adoption of the Fourth Amendment "seizure" standard proposed by Justice Stewart in *Mendenhall:* Fourth Amendment protections apply when "official authority" is exercised "such that 'a reasonable person would have believed he was not free to leave.'" *Ante,* at 502, quoting 446 U. S., at 554.   I do not quarrel with the plurality's conclusion that at some point in this encounter, that threshold was passed.   I also agree that the information available prior to the opening of Royer's suitcases did not constitute probable cause to arrest; thus, if probable cause was required, the seizure was illegal and the resulting consent to search was invalid.   *Dunaway* v. *New York,* 442 U. S. 200, 216–219 (1979); *Brown* v. *Illinois,* 422 U. S. 590, 601–604 (1975).   The dispositive issue, however, is whether the officers needed probable cause to arrest before they could take the actions that led to Royer's consent and the subsequent discovery of the contraband.   I conclude that they did not.

## A

"'[T]he key principle of the Fourth Amendment is reasonableness—the balancing of competing interests.'" *Michigan* v. *Summers,* 452 U. S. 692, 700, n. 12 (1981), quoting *Dunaway* v. *New York,* 442 U. S., at 219 (WHITE, J., concurring).   Previous cases suggest a two-step analysis to distinguish seizures requiring probable cause from those requiring reasonable suspicion.   On the one hand, any formal arrest, and any seizure "having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." *Michigan* v. *Summers,* 452 U. S., at 700.   On the other hand, a more limited intrusion, if supported by a special law enforcement need for greater flexibility, may be justifiable under the lesser "reasonable suspicion" standard. These lesser seizures are "not confined to the momentary, on-the-street detention accompanied by a frisk for weapons." *Ibid.*   In the case of a seizure less intrusive than a formal arrest, determining whether the less demanding reasonable-

suspicion standard will be applied requires balancing the amount of intrusion upon individual privacy against the special law enforcement interests that would be served by permitting such an intrusion on less than probable cause. See *Michigan* v. *Summers*, 452 U. S., at 699–701; *United States* v. *Mendenhall*, 446 U. S., at 561 (POWELL, J., concurring in part); *Dunaway* v. *New York*, 442 U. S., at 219–220 (WHITE, J., concurring); *United States* v. *Martinez-Fuerte*, 428 U. S. 543, 555 (1976); *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 878–881 (1975).

## B

At the suppression hearing in this case, Royer agreed that he was not formally arrested until after his suitcases were opened. App. 84A, 85A. In my view, it cannot fairly be said that, prior to the formal arrest, the functional equivalent of an arrest had taken place. The encounter had far more in common with automobile stops justifiable on reasonable suspicion, see *United States* v. *Brignoni-Ponce*, 422 U. S., at 880–882, than with the detention deemed the functional equivalent of a formal arrest in *Dunaway* v. *New York*, *supra*. In *Dunaway*, the suspect was taken from his neighbor's home and involuntarily transported to the police station in a squad car. At the precinct house, he was placed in an interrogation room and subjected to extended custodial interrogation. 442 U. S., at 203, 206–207, 212. Here, Royer was not taken from a private residence, where reasonable expectations of privacy perhaps are at their greatest. Instead, he was approached in a major international airport where, due in part to extensive antihijacking surveillance and equipment, reasonable privacy expectations are of significantly lesser magnitude, certainly no greater than the reasonable privacy expectations of travelers in automobiles. See *United States* v. *Martinez-Fuerte*, 428 U. S., at 561. As in the automobile stop cases, and indeed as in every case in which the Court has upheld seizures upon reasonable suspicion, Royer was questioned where he was found, and all

questions were directly related to the purpose of the stop. Thus, the officers asked about Royer's identity, the purposes of his travel, and the suspicious circumstances they had noted. As the plurality appears to concede, *ante*, at 502, probable cause was certainly not required at this point, and the officers' conduct was fully supported by reasonable suspicion.

What followed was within the scope of the lesser intrusions approved on less than probable cause in our prior cases, and was far removed from the circumstances of *Dunaway*. In the context of automobile stops, the Court has held that an officer "may question the driver and passengers about their citizenship and immigration status, and he may ask them to explain suspicious circumstances, but any further detention or search must be based on consent or probable cause." *United States* v. *Brignoni-Ponce*, 422 U. S., at 881–882, quoted with approval in *Dunaway*, 442 U. S., at 212. Here, Royer was not subjected to custodial interrogation, for which probable cause is required. *Dunaway*, 442 U. S., at 216. Instead, the officers first sought Royer's consent to move the detention 40 feet to the police room, and then sought his consent to search his luggage. The question is whether, as in *Dunaway*, the move was involuntary, in which case probable cause might have been required, or whether, as in *Mendenhall*, 446 U. S., at 557–558, Royer consented voluntarily to this change of locale. Like JUSTICE REHNQUIST, *post*, at 530–531, I do not understand the plurality to dispute that Royer consented to go to the police room. Because the detention up to this point was not unlawful, the voluntariness of Royer's consent is to be judged on the totality of the circumstances. *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 227 (1973). As in *Mendenhall*, 446 U. S., at 557, quoting *Sibron* v. *New York*, 392 U. S. 40, 63 (1968), Royer went "'voluntarily in a spirit of apparent cooperation.'"[1]

---

[1] The trial judge, App. 115A–116A, and the appellate panel, 389 So. 2d 1007, 1008–1010 (Fla. App. 1979), so found, and the Florida District Court

Had Royer initially refused to consent to the search of his suitcases, and had the officers continued the detention in the hope that he would change his mind, a situation much closer to *Dunaway* would have been presented. But once he was in the room,[2] Royer consented to the search immediately upon request. Neither the plurality nor the Florida Court of Appeal suggests that, judged on the totality of the circumstances, Royer's consent to the search was involuntary.

---

of Appeal, which viewed the evidence in the light most favorable to the State, *id.*, at 1016, did not contradict this finding. This is not inconsistent with a possible finding that at the time the request was made, Royer reasonably believed that he was not free to leave the officers' presence. As the officers framed the request, Royer might have believed that his only choices, for the moment, were to accompany the officers to the police room or to continue the discussion in the public concourse. His consent to moving the discussion, therefore, was voluntary, even if the detention itself was not.

[2] The character of the police room did not transform the encounter into the functional equivalent of an arrest. See *post*, at 532, and n. 10 (REHNQUIST, J., dissenting). Indeed, the plurality does not rely on any differences between this room and the one in *Mendenhall* to distinguish this encounter from the encounter held in *Mendenhall* to require at most reasonable suspicion. *Ante*, at 503–504, n. 9. The plurality instead points to several other differences between this case and *Mendenhall:* the officers retained Royer's ticket and identification, momentarily took possession of Royer's luggage, and did not advise him that he could decline to be searched. *Ante*, at 504, n. 9. Like JUSTICE POWELL, I considered the question whether a threshold seizure had taken place in *Mendenhall* to be "extremely close." 446 U. S., at 560, n. 1 (POWELL, J., concurring in part). Thus, notwithstanding the facts that, unlike the suspect in *Mendenhall*, Royer was a well-educated, adult, Caucasian male, cf. *id.*, at 558 ("that the respondent, a female and a Negro, may have felt unusually threatened by the officers, who were white males," is "not irrelevant" to the degree of coercion), the differences noted by the plurality lead me to agree that a reasonable person in Royer's circumstances would not have felt free to walk away. But while these differences did transform this otherwise identical encounter from an arguably consensual one into a seizure clearly requiring *some* justification under the Fourth Amendment, they are not so significant as to require the conclusion that Royer had been subjected to the equivalent of a full-blown arrest.

Thus, the officers in this case followed the formula for "lesser intrusions" set forth in *Brignoni-Ponce* and approved in *Dunaway:* beyond the initial stop and properly limited questioning, further detention and search were based on Royer's consent. Certainly, the intrusion on Royer's privacy was not so extreme as to make the countervailing public interest in greater flexibility irrelevant to the question whether probable cause was required. Consequently, I do not understand why the plurality fails to balance the character of the detention and the degree to which it intruded upon Royer's privacy against its justification as measured by "both the law enforcement interest and the nature of the 'articulable facts' supporting the detention." *Michigan* v. *Summers*, 452 U. S., at 702. This balance should determine whether probable cause or reasonable suspicion was required to support the officers' conduct, and whether that conduct was lawful under the appropriate standard.

## II

The officers in this case began their encounter with Royer with reasonable suspicion. They continued their questioning and requested further cooperation only as more facts, heightening their suspicion, came to their attention. Certainly, as any such detention continues or escalates, a greater degree of reasonable suspicion is necessary to sustain it, and at some point probable cause will be required. But here, the intrusion was short-lived and minimal. Only 15 minutes transpired from the initial approach to the opening of the suitcases. The officers were polite, and sought and immediately obtained Royer's consent at each significant step of the process.[3] Royer knew that if the search of the suitcases did not

---

[3] The officers acted reasonably in taking Royer's baggage stubs and bringing his luggage to the police room without his consent. Royer had already surrendered the suitcases to a third party, the airline. The officers brought the suitcases to him immediately, and their contents were not revealed until Royer gave his consent. Thus, Royer's privacy was not substantially invaded. At that time, moreover, Royer himself was validly

turn up contraband, he would be free to go on his way.[4] Thus, it seems clear to me that "'the police [were] diligently pursuing a means of investigation which [was] likely to resolve the matter one way or another very soon . . . .'" *Michigan* v. *Summers*, 452 U. S., at 701, n. 14, quoting 3 W. LaFave, Search and Seizure § 9.2, p. 40 (1978).[5]

The special need for flexibility in uncovering illicit drug couriers is hardly debatable. Surely the problem is as serious, and as intractable, as the problem of illegal immigration discussed in *United States* v. *Brignoni-Ponce*, 422 U. S., at 878–879, and in *United States* v. *Martinez-Fuerte*, 428 U. S., at 552. In light of the extraordinary and well-documented difficulty of identifying drug couriers, the minimal intrusion in this case, based on particularized suspicion, was eminently reasonable.

I dissent.

JUSTICE REHNQUIST, with whom THE CHIEF JUSTICE and JUSTICE O'CONNOR join, dissenting.

The plurality's meandering opinion contains in it a little something for everyone, and although it affirms the reversal of a judgment of conviction, it can scarcely be said to bespeak

---

detained, the object of the encounter had become the securing of Royer's consent to search his luggage, and the luggage would otherwise have been loaded onto the airplane.

[4] The fact that Royer knew the search was likely to turn up contraband is of course irrelevant; the potential intrusiveness of the officers' conduct must be judged from the viewpoint of an innocent person in Royer's position. See *United States* v. *Wylie*, 186 U. S. App. D. C. 231, 237, 569 F. 2d 62, 68 (1977), cert. denied, 435 U. S. 944 (1978).

[5] Like JUSTICE REHNQUIST, *post*, at 528, I cannot accept the "least intrusive" alternative analysis the plurality would impose on the law of the Fourth Amendment. See *ante*, at 500. Prior cases do establish that "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Ibid.* The detention at issue fully met that standard. The cases relied upon by the plurality do not, however, support the further proposition for which it cites them.

a total indifference to the legitimate needs of law enforcement agents seeking to curb trafficking in dangerous drugs. Indeed, in both manner and tone, the opinion brings to mind the old nursery rhyme:

"The King of France
With forty thousand men
Marched up the hill
And then marched back again."

The opinion nonetheless, in my view, betrays a mind-set more useful to those who officiate at shuffleboard games, primarily concerned with which particular square the disc has landed on, than to those who are seeking to administer a system of justice whose twin purposes are the conviction of the guilty and the vindication of the innocent. The plurality loses sight of the very language of the Amendment which it purports to interpret:

"The right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated . . . ." (Emphasis added.)

Analyzed simply in terms of its "reasonableness" as that term is used in the Fourth Amendment, the conduct of the investigating officers toward Royer would pass muster with virtually all thoughtful, civilized persons not overly steeped in the mysteries of this Court's Fourth Amendment jurisprudence. Analyzed even in terms of the most meticulous regard for our often conflicting cases, it seems to me to pass muster equally well.

The facts of this case, which are doubtless typical of those facing narcotics officers in major airports throughout the country, may be usefully stated in a somewhat different manner than that followed in the opinion of the plurality. Officers Magdalena and Johnson, members of the "Smuggling Detail" of the Dade County Public Safety Department created in response to a growing drug problem at the Miami Air-

port, were on duty at that airport on January 3, 1978. Since this is one of the peak periods of the tourist season in south Florida and the Caribbean, we may presumably take judicial notice that the airport was in all probability very crowded and busy at that time.

The detectives first saw Royer walking through the airport concourse. He was a young man, casually dressed, carrying two heavily laden suitcases. The officers described him as nervous in appearance, and looking around in a manner which suggested that he was trying to detect and avoid police officers. Before they approached him, the officers followed Royer to a ticket counter. He there requested a ticket for New York City, and in paying for it produced a large roll of cash in small denomination bills from which he peeled off the necessary amount. He then affixed two baggage tags to his luggage and checked it. Rather than filling out his full name, address, and phone number in the spaces provided on the tags, Royer merely wrote the words "Holt" and "La Guardia" on each tag.

At this point, the officers approached Royer, identified themselves, and asked if he had a moment to talk. He answered affirmatively, and the detectives then asked to see his airline ticket and some identification.[1] Although his ticket was for the name "Holt," his driver's license was in the name of "Mark Royer." When asked to explain this discrepancy, he said that a friend named Holt had made the ticket reservation. This explanation, of course, did not account for his use of the name "Holt" on the baggage tags that he had just filled out.

By this time Royer had become all the more obviously nervous. The detectives told Royer that they suspected he was transporting narcotics, and asked if he would accompany

---

[1] The plurality recites these facts by noting that while Royer "produced" the ticket and identification, he did so "without oral consent." *Ante*, at 494. See n. 2, *infra*.

them for further questioning to a room adjacent to the concourse "to get out of the general population of the Airport." 389 So. 2d 1007, 1017 (Fla. App. 1980) (en banc). Royer agreed to go. The room was no more than 40 feet from the place where the detectives first approached Royer; it was described in the testimony of one of the officers as a "large storage closet" off a stewardesses' lounge converted into a room used by the Smuggling Detail, *ibid.;* the room contained a desk and two chairs. At this time the detectives also, without Royer's consent, retrieved Royer's suitcases from the place where they had been checked through on the flight to New York and brought them to the room off the concourse.

Once inside, the detectives asked Royer if he would consent to a search of the luggage so that they could dispel or confirm their suspicion that he was smuggling narcotics. The plurality's opinion describes what then happened:

"Without orally responding to this request, Royer produced a key and unlocked one of the suitcases, which the detective then opened without seeking further assent from Royer. Marihuana was found in that suitcase. According to Detective Johnson, Royer stated that he did not know the combination to the lock on the second suitcase. When asked if he objected to the detective opening the second suitcase, Royer said, 'no, go ahead,' and did not object when the detective explained that the suitcase might have to be broken open. The suitcase was pried open by the officers and more marihuana was found. Royer was then told that he was under arrest. Approximately 15 minutes had elapsed from the time the detectives initially approached respondent until his arrest upon the discovery of the contraband." *Ante,* at 494–495.[2]

---

[2] Why it should make the slightest difference that Royer did not "orally" consent to the opening of the first bag, when in response to the request by the officers that he consent to a search Royer produced a key and unlocked it, is one of the many opaque nuances of the plurality's opinion.

The plurality inferentially concedes, as of course it must, that at the time the suitcases were opened and 65 pounds of marihuana were disclosed, the officers had probable cause to arrest and detain Royer. But working backward through this very brief encounter, the plurality manages to sufficiently fault the officers' conduct so as to require that Royer's conviction for smuggling drugs be set aside. Analyzed in terms of the "reasonableness" which must attend any search and seizure under the requirements of the Fourth Amendment, I find it impossible to conclude that any step in the officers' efforts to apprehend Royer fails to meet that test.

The plurality concedes that after their initial conversation with Royer, the officers had "grounds for suspecting Royer of carrying drugs and for temporarily detaining him and his luggage while they attempted to verify or dispel their suspicions . . . ." *Ante,* at 502. See also *Michigan* v. *Summers,* 452 U. S. 692, 697–700 (1981); *Adams* v. *Williams,* 407 U. S. 143, 146 (1972); *Terry* v. *Ohio,* 392 U. S. 1, 20–21 (1968). I agree that their information reached at least this level.[3] The detectives had learned, among other things, that (1) Royer was carrying two heavy suitcases; (2) he was visibly nervous, exhibiting the behavior of a person trying to iden-

---

[3] I also agree with the plurality's intimation that when the detectives first approached and questioned Royer, no seizure occurred and thus the constitutional safeguards of the Fourth Amendment were not invoked. *Ante,* at 497. "[N]ot all personal intercourse between policemen and citizens involves 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry* v. *Ohio,* 392 U. S., at 19, n. 16. See also *United States* v. *Mendenhall,* 446 U. S. 544, 551–557 (1980) (opinion of Stewart, J.); *id.,* at 560, n. 1 (POWELL, J., concurring in part); *United States* v. *Herbst,* 641 F. 2d 1161, 1166 (CA5), cert. denied, 454 U. S. 851 (1981); *United States* v. *Berd,* 634 F. 2d 979, 984–985 (CA5 1981); *United States* v. *Turner,* 628 F. 2d 461, 462–465 (CA5 1980), cert. denied, 451 U. S. 988 (1981); *United States* v. *Hill,* 626 F. 2d 429, 432–433, and n. 6 (CA5 1980); *United States* v. *Fry,* 622 F. 2d 1218, 1220–1221 (CA5 1980); *United States* v. *Elmore,* 595 F. 2d 1036, 1038–1042 (CA5 1979), cert. denied, 447 U. S. 910 (1980).

tify and evade police officers; (3) at a ticket counter in a major import center for illicit drugs, he had purchased a ticket for a city that is a major distribution center for such drugs; (4) he paid for his ticket from a large roll of small denomination bills, avoiding the need to show identification; (5) in filling out his baggage tags, Royer listed only a last name and the airport of destination, failing to give his full name, address, and phone number in the provided spaces, and (6) he was traveling under an assumed name.[4]

The Florida court felt that even these facts did not amount to articulable suspicion, reasoning that this behavior was "at least equally, and usually far more frequently, consistent with complete innocence."[5] 389 So. 2d, at 1016. This eval-

---

[4] The facts of this case bear a strong resemblance to those we examined in *United States* v. *Mendenhall, supra.* In that case, DEA agents in the Detroit Metropolitan Airport observed Mendenhall as she was the last passenger to deplane from a flight originating in Los Angeles. Once inside the terminal, Mendenhall, who appeared very nervous, slowly scanned the populace of the concourse and then walked very slowly toward the baggage area. Rather than claim any baggage, however, Mendenhall asked for directions to the Eastern Airlines ticket counter. At the counter, which was located in another terminal, Mendenhall, who carried an American Airlines ticket for a flight from Detroit to Pittsburgh, asked for an Eastern Airlines ticket for the same trip. Before Mendenhall could board the Eastern Airlines flight, agents stopped her for questioning. Three Members of this Court concluded that, based on these observations alone, the agents had a reasonable suspicion which justified the stop. 446 U. S., at 560–565 (POWELL, J., joined by BURGER, C. J., and BLACKMUN, J., concurring in part). Two Members of the Court did not reach the question, finding instead that Mendenhall had never been "seized." *Id.*, at 546–557 (opinion of Stewart, J., joined by REHNQUIST, J.). To the extent that the present case differs from *Mendenhall*, the basis for a reasonable suspicion is stronger on the facts before us now.

[5] The Florida District Court of Appeal took specific exception to the officers' conclusion that Royer appeared to be nervously attempting to evade police contact. The lower court said that since police officers are not psychiatrists, this conclusion "must be completely disregarded." 389 So. 2d, at 1016, n. 4. This Court, however, has repeatedly emphasized that a trained police officer may draw inferences and make deductions that could elude any untrained person observing the same conduct. See, *e. g.,*

uation of the evidence seems to me singularly akin to observing that because a stranger who was loitering near a building shortly before an arsonist set fire to the building could not be detained against his will for questioning solely on the basis of that fact, the same conclusion would be reached even though the same stranger had been found loitering in the presence of four other buildings shortly before arsonists had likewise set them on fire. Any one of these factors relied upon by the Miami police may have been as consistent with innocence as with guilt; but the combination of several of these factors is the essence of both "articulable suspicion" and "probable cause." [6]

---

*United States* v. *Cortez*, 449 U. S. 411, 418 (1981). We have noted as an example the behavior of a suspect who appears to the officer to be evading police contact. See, *e. g.*, *United States* v. *Mendenhall*, *supra*, at 564 (opinion of Stewart, J.); *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 884–885 (1975).

[6] While the plurality does not address the use of "drug courier profiles" in narcotics investigations, it affirms a decision where the Florida District Court of Appeal took the liberty to fashion a bright-line rule with regard to the use of these profiles. The state court concluded that conformity with a "drug courier profile," "without more," is insufficient to establish even reasonable suspicion that criminal activity is afoot. 389 So. 2d, at 1017, n. 6 (emphasis deleted).

In 1974 the Department of Justice Drug Enforcement Administration instituted training programs for its narcotics officers wherein instruction was given on a "drug courier profile." A "profile" is, in effect, the collective or distilled experience of narcotics officers concerning characteristics repeatedly seen in drug smugglers. As one DEA agent explained:

"Basically, it's a number of characteristics which we attribute or which we believe can be used to pick out drug couriers. And these characteristics are basically things that normal travelers do not do . . . .

.        .        .        .        .        .

"Essentially, when we started this detail at the airport, we didn't really know what we were looking for. The majority of our cases, when we first started, involved cases we made based on information from law enforcement agencies or from airline personnel. And as these cases were made, certain characteristics were noted among the defendants.

"At a later time we began to see a pattern in these characteristics and began using them to pick out individuals we suspected as narcotic couriers

The point at which I part company with the plurality's opinion is in the assessment of the reasonableness of the officers' conduct following their initial conversation with Royer.

---

without any prior information." *United States* v. *McClain,* 452 F. Supp. 195, 199 (ED Mich. 1977).

Few statistics have been kept on the effectiveness of "profile" usage, but the data available suggest it has been a success. In the first few months of a "profile" program at the Detroit Metropolitan Airport, 141 persons were searched in 96 different encounters; drugs were discovered in 77 of the searches. See *United States* v. *Van Lewis,* 409 F. Supp. 535, 538 (ED Mich. 1976), aff'd, 556 F. 2d 385 (CA6 1977), cert. denied, 434 U. S. 1011 (1978). A DEA agent working at the La Guardia Airport in New York City estimated that some 60% percent of the persons identified as having "profile" characteristics are found to be carrying drugs. *United States* v. *Price,* 599 F. 2d 494, 501, n. 8 (CA2 1979).

Because of this success, state and local law enforcement agencies also have instructed narcotics officers according to "drug courier profiles." It was partly on the basis of "profile" characteristics that Detectives Johnson and Magdalena initially began surveillance of Royer. Certainly in this case the use of the "profile" proved effective.

Use of "drug courier profiles" has played an important part in a number of lower court decisions. See, *e. g., United States* v. *Forero-Rincon,* 626 F. 2d 218 (CA2 1980); *United States* v. *Vasquez,* 612 F. 2d 1338 (CA2 1979), cert. denied, 447 U. S. 907 (1980); *United States* v. *Price,* 599 F. 2d 494 (CA2 1979); *United States* v. *Diaz,* 503 F. 2d 1025 (CA3 1974); *United States* v. *Sullivan,* 625 F. 2d 9 (CA4 1980), cert. denied, 450 U. S. 923 (1981); *United States* v. *Hill,* 626 F. 2d 429 (CA5 1980); *United States* v. *Ballard,* 573 F. 2d 913 (CA5 1978); *United States* v. *Smith,* 574 F. 2d 882 (CA6 1978); *United States* v. *Scott,* 545 F. 2d 38 (CA8 1976), cert. denied 429 U. S. 1066 (1977); *United States* v. *Beck,* 598 F. 2d 497 (CA9 1979). In fact, the function of the "profile" has been somewhat overplayed. Certainly, a law enforcement officer can rely on his own experience in detection and prevention of crime. Likewise, in training police officers, instruction focuses on what has been learned through the collective experience of law enforcers. The "drug courier profile" is an example of such instruction. It is not intended to provide a mathematical formula that automatically establishes grounds for a belief that criminal activity is afoot. By the same reasoning, however, simply because these characteristics are accumulated in a "profile," they are not to be given less weight in assessing whether a suspicion is well founded. While each case will turn on its own facts, sheer logic dictates that where certain characteristics repeatedly are found among drug smugglers, the existence of those characteristics in a

The plurality focuses on the transfer of the place of the interview from the main concourse of the airport to the room off the concourse and observes that Royer "found himself in a small room—a large closet—equipped with a desk and two chairs. He was alone with two police officers who again told him that they thought he was carrying narcotics. He also found that the officers, without his consent, had retrieved his checked luggage from the airline." *Ante*, at 502–503.

Obviously, this quoted language is intended to convey stern disapproval of the described conduct of the officers. To my mind, it merits no such disapproval and was eminently reasonable. Would it have been preferable for the officers to have detained Royer for further questioning, as they concededly had a right to do, without paying any attention to the fact that his luggage had already been checked on the flight to New York, and might be put aboard the flight even though Royer himself was not on the plane? Would it have been more "reasonable" to interrogate Royer about the contents of his suitcases, and to seek his permission to open the suitcases

---

particular case is to be considered accordingly in determining whether there are grounds to believe that further investigation is appropriate. Cf. *United States* v. *Cortez*, 449 U. S. 411, 418 (1981).

The "drug courier profile" is not unfamiliar to this Court. We have held that conformity with certain aspects of the "profile" does not automatically create a particularized suspicion which will justify an investigatory stop. *Reid* v. *Georgia*, 448 U. S. 438 (1980) *(per curiam)*. Yet our decision in *United States* v. *Mendenhall*, 446 U. S. 544 (1980), made it clear that a police officer is entitled to assess the totality of the circumstances in the light of his own training and experience and that instruction on a "drug courier profile" would be a part of his accumulated knowledge. This process is not amenable to bright-line rules such as the Florida court tried to establish. We are not dealing "with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as factfinders are permitted to do the same—and so are law enforcement officers. Finally, the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States* v. *Cortez, supra*, at 418. See also *Brown* v. *Texas*, 443 U. S. 47, 52, n. 2 (1979).

when they were retrieved, in the busy main concourse of the Miami Airport, rather than to find a room off the concourse where the confrontation would surely be less embarrassing to Royer? If the room had been large and spacious, rather than small, if it had possessed three chairs rather than two, would the officers' conduct have been made reasonable by these facts?

The plurality's answers to these questions, to the extent that it attempts any, are scarcely satisfying. It commences with the observation that "the officers' conduct was more intrusive than necessary to effectuate an investigative detention otherwise authorized by the *Terry* line of cases." *Ante*, at 504. Earlier in its opinion, the plurality set the stage for this standard when the familiar "least intrusive means" principle of First Amendment law is suddenly carried over into Fourth Amendment law by the citation of two cases, *United States* v. *Brignoni-Ponce*, 422 U. S. 873, 881–882 (1975), and *Adams* v. *Williams*, 407 U. S., at 146, see *ante*, at 500, neither one of which lends any support to the principle as a part of Fourth Amendment law. The plurality goes on to say that had the officers returned Royer's ticket and driver's license, the encounter clearly would have been consensual. The plurality also states that while there were good reasons to justify moving Royer from one location to another, the officers' motives in seeking to examine his luggage render these reasons unavailing—a conclusion the reason for which wholly escapes me. Finally, the plurality suggests that the officers might have examined Royer's bags in a more expeditious way, such as the use of trained dogs.

All of this to my mind adds up to little more than saying that if my aunt were a man, she would be my uncle. The officers might have taken different steps than they did to investigate Royer, but the same may be said of virtually every investigative encounter that has more than one step to it. The question we must decide is what was *unreasonable* about the steps which *these officers* took with respect to *this* sus-

pect in the Miami Airport on this particular day.    On this point, the plurality stutters, fudges, and hedges:

"What had begun as a consensual inquiry in a public place had escalated into an investigatory procedure in a police interrogation room, where the police, unsatisfied with previous explanations, sought to confirm their suspicions." *Ante,* at 503.

But since even the plurality concedes that there was articulable suspicion warranting an investigatory detention, the fact that the inquiry had become an "investigatory procedure in a police interrogation room" would seem to have little bearing on the proper disposition of a claim that the officers violated the Fourth Amendment.    The plurality goes on to say:

"At least as of that moment, any consensual aspects of the encounter had evaporated, and we cannot fault the Florida District Court of Appeal in concluding that *Terry* v. *Ohio* and the cases following it did not justify the restraint to which Royer was then subjected.    As a practical matter, Royer was under arrest." *Ibid.*

Does the plurality intimate that if the Florida District Court of Appeal had reached the opposite conclusion with respect to the holdings of *Terry* and the cases which follow it, it would affirm that holding?[7]    Does it mean that the 15-minute duration of the total encounter, and the even lesser amount of elapsed time during which Royer was in the "interrogation room," was more than a *Terry* investigative stop can ever consume?    These possible conclusions are adumbrated, but not stated; if the plurality's opinion were to be

---

[7] See also *ante,* at 501 ("The question before us is whether the record warrants that conclusion"); *ante,* at 507 ("[W]e think that the Florida District Court of Appeal cannot be faulted in concluding that the limits of a *Terry*-stop had been exceeded").    Certainly we owe no such deference to the Florida court's conclusion.    See *Haynes* v. *Washington,* 373 U. S. 503, 515–516 (1963) (citing *Stein* v. *New York,* 346 U. S. 156, 181 (1953)); *Fiske* v. *Kansas,* 274 U. S. 380, 385–386 (1927).

judged by standards appropriate to Impressionist paintings, it would perhaps receive a high grade, but the same cannot be said if it is to be judged by the standards of a judicial opinion.

Since the plurality concedes the existence of "articulable suspicion" at least after the initial conversation with Royer, the only remaining question is whether the detention of Royer during that period of time was permissible under the rule enunciated in *Terry* v. *Ohio*, 392 U. S. 1 (1968). Although *Terry* itself involved only a protective patdown for weapons, subsequent cases have expanded the permissible scope of such a "seizure." In *Adams* v. *Williams, supra,* we upheld both a search and seizure of a pistol being carried by a suspect seated in a parked automobile. In *United States* v. *Martinez-Fuerte,* 428 U. S. 543 (1976), we allowed Government officials to stop, and divert for visual inspection and questioning, automobiles which were suspected of harboring illegal aliens. These stops, including waiting time, could clearly have approximated in length the time which Royer was detained, and yet *Martinez-Fuerte* allowed them to be made "in the absense of *any individualized suspicion* at reasonably located checkpoints." *Id.,* at 562 (emphasis supplied). Unless we are to say that commercial drug trafficking is somehow quantitatively less weighty on the Fourth Amendment scale than trafficking in illegal aliens, I think the articulable suspicion which concededly focused upon Royer justified the length and nature of his detention.[8]

The reasonableness of the officers' activity in this case did not depend on Royer's consent to the investigation. Nevertheless, the presence of consent further justifies the action taken. The plurality does not seem to dispute that Royer

---

[8] The detention of Royer would also pass muster under this Court's Fourth Amendment jurisprudence if the officers had "a reasonable ground for belief of guilt" prior to their adjournment to the room. *Brinegar* v. *United States,* 338 U. S. 160, 175 (1949). But since the officers clearly had an articulable suspicion to justify the detention under *Terry* v. *Ohio,* 392 U. S. 1 (1968), the probable-cause issue need not be decided in this case.

consented to go to the room in the first instance. Certainly that conclusion is warranted by the totality of the circumstances. *Schneckloth* v. *Bustamonte,* 412 U. S. 218, 227 (1973). The facts are similar to those addressed in *United States* v. *Mendenhall,* 446 U. S. 544 (1980), where a majority of the Court determined that the consent to accompany police officers had been voluntary. Royer was not told that he had to go to the room, but was simply asked, after a brief period of questioning, if he would accompany the detectives to the room. Royer was informed as to why the officers wished to question him further. There were neither threats nor any show of force. Detectives Johnson and Magdelena were not in uniform and did not display weapons. The detectives did not touch Royer and made no demands. In fact, Royer admits that the detectives were quite polite.[9]

The plurality concludes that somewhere between the beginning of the 40-foot journey and the resumption of conversation in the room the investigation became so intrusive that Royer's consent "evaporated" leaving him "[a]s a practical matter . . . under arrest." *Ante,* at 503. But if Royer was legally approached in the first instance and consented to accompany the detectives to the room, it does not follow that his consent went up in smoke and he was "arrested" upon entering the room. As we made clear in *Mendenhall,* logical analysis would focus on whether the environment in the room rendered the subsequent consent to a search of the luggage involuntary.

---

[9] Contrary to the Florida court's view, this phase of the encounter contrasts sharply with the circumstances we examined in *Dunaway* v. *New York,* 442 U. S. 200 (1979). In that case, police officers deliberately sought out the suspect at a neighbor's house and, with a show of force, brought the suspect to police headquarters in a police car, placed him in an interrogation room, and questioned him extensively after giving him a *Miranda* warning. Unlike in *Dunaway,* Royer, after brief questioning, was *asked to cooperate* by accompanying the officers to a room no more than 40 feet away, so that the questioning could proceed out of the view of the general public.

As we said in *Mendenhall*, "the fact that she was [in the room] is little or no evidence that she was in any way coerced." 446 U. S., at 559. Other than the size of the room, described as "a large storage closet,"[10] there is nothing in the record which would indicate that Royer's resistance was overborne by anything about the room. Royer, who was in his fourth year of study at Ithaca College at the time and has since graduated with a degree in *communications*, simply continued to cooperate with the detectives as he had from the beginning of the encounter. Absent any evidence of objective indicia of coercion, and even absent any claim of such indicia by Royer, the size of the room itself does not transform a voluntary consent to search into a coerced consent.

For any of these several reasons, I would reverse the judgment of the Florida District Court of Appeal.

---

[10] The characterization of the room as a "closet" is quite misleading. The room contained one desk and two chairs. It was large enough to allow three persons to enter with two heavy suitcases. It also is relevant that it was the Florida court, not Royer, who focused on the size of the room. Royer appealed his conviction arguing that his consent to a search was invalid as a matter of law because he was not informed that he could refuse consent. A panel of the Florida court properly rejected this contention, relying on *Schneckloth* v. *Bustamonte*, 412 U. S. 218, 234 (1973), where we said that "proof of knowledge of a right to refuse [is not] the *sine qua non* of an effective consent to a search." It was during rehearing by the court en banc that the conviction was reversed with the court finding that when Royer was taken into the private room he was in effect placed under arrest.