UNITED STATES of America,

v.

**William Wade GREEN.**

No. EP–94–CR–338–DB.

United States District Court,
W.D. Texas,
El Paso Division.

Jan. 24, 1995.

---

Assistant U.S. Atty. Carlos Hermosillo, for plaintiff.

Robert Harris, for defendant.

## ORDER

BRIONES, District Judge.

On this day, the Court considered the Motion to Suppress Evidence in the above-styled and numbered cause. Following a hearing on December 22, 1994, the Court is of the opinion that the motion is meritorious and should be granted.

### Statement of Facts

On August 30, 1994, while working in an undercover capacity, Special Agent Sal Martinez ("SA Martinez") of the Drug Enforcement Administration ("DEA"), met with Jesus Carrillo–Gomez ("Carrillo") to negotiate the purchase of 100 kilograms of cocaine. The agent was introduced to Carrillo by a confidential informant ("C.I."). This meeting took place at the Fajita Cocina located on N. Mesa, El Paso, Texas. Carrillo told SA Martinez that he would sell 10 kilograms first and then the remaining amount later that day. The price that was discussed was between $12,500 and $13,000 per kilogram. Carrillo, the C.I. and SA Martinez then went to the parking lot of the Sam's Club located at 7970 N. Mesa, El Paso, Texas.

While at the Sam's Club parking lot, Carrillo pointed out a brown Chevrolet Celebrity (with NM license plates) to SA Martinez and the C.I. Carrillo stated that the keys for the car were in the ashtray and that the car contained the 10 kilograms of cocaine in the trunk. SA Martinez and the C.I. took the car to check it while Carrillo remained by the pay telephone at the parking lot. When DEA agents checked the car they found that it contained 8 kilograms of cocaine.

SA Martinez and the C.I. returned to the Sam's Club parking lot and met with Carrillo. AS Martinez then paid Carrillo $25,000 for the purchase of two kilograms of cocaine. Carrillo took the money but said that he would not be able to obtain any more cocaine until SA Martinez paid for the other 6 kilos. The C.I. and Carrillo then left and went to the Peter Piper Pizza located at 7955 N. Mesa. While the C.I. waited inside, Carrillo met with two individuals later identified as Roberto Garcia Perez ("Perez") and Martin Rodriguez–DeSantiago ("Rodriguez") in the parking lot. They met at a Ford Supercab pick-up truck that was parked in the lot. After the meeting, Carrillo and the C.I. returned to the Pizza Hut where they met with SA Martinez.

After their meeting with Carrillo, Perez and Rodriguez left in the Ford truck and went to the Sam's parking lot. At the parking lot Rodriguez got in the now empty Chevrolet Celebrity and left. Perez went in the Ford truck to Prince Machiavelli's Lounge at 533 Executive Center. At Machiavelli's Perez met with two individuals, Antonio Gonzalez ("Gonzalez") and Jeremy Garza Mireles ("Mireles"). After meeting with Perez, Gonzalez and Mireles left in a blue Lincoln Continental and were followed to an east El Paso Self–Storage facility located at 11100 Montana.

At the storage facility, DEA agents William Massey and Mike Bogdon saw Gonzalez open storage unit # 1. The agents then drove up to Gonzalez accompanied by marked El Paso Police cars. After identifying themselves and explaining to Gonzalez what the agents were investigating, the agents asked Gonzalez for consent to search his car and the storage unit. Gonzalez gave the consent. Gonzalez told the agents that he had gone to Prince Machiavelli to meet with Perez about buying some furniture. Gonzalez gave the agents a telephone number he had that he would use to contact Perez. The agents told Gonzalez that they had followed him from the club and wanted to know why he had gone to the storage facility. Gonzalez told the agents that he was a broker in beans and that he had gone to the storage facility to get some beans to

take home. While the car and storage unit were being checked, the agents received a call from one of the other agents who told them to arrest Gonzalez and Mireles as they were involved with the individuals who had delivered the cocaine to SA Martinez. Gonzalez and Mireles were then arrested.

The agents themselves searched the storage unit where they found one package of cocaine (weighing approximately 800 grams and wrapped the same way as the eight kilograms of cocaine delivered to SA Martinez by Carrillo) inside a storage cabinet.

Perez (in the Ford truck) had been followed to the Motel 6 on Mesa and I–10 after his meeting with Gonzalez and Mireles at Prince Machiavelli's. The Ford truck was then seen leaving the Motel 6 and was followed by the agents. Initially, the agents did not know who was driving the Ford truck. While the Ford truck was on Mesa street, the truck rear-ended a Jeep. This accident occurred near the Silo store on Mesa. Both the Jeep and Ford truck pulled into a parking lot at which time the agents learned that the driver was a white male and not Perez or any other person previously identified as being a part of the drug deal. After conferring with the driver of the Jeep, the driver of the Ford truck eventually got on I–10 East. Assisting the federal agents were officers of the El Paso Police Department. The police officers were asked by the DEA to stop the Ford truck and take the driver of the truck into custody. The police officers eventually made the stop after the Ford truck exited I–10 East at the Reynolds exit.

As the police officers approached either side of the Ford truck, one of the officers noticed a knife within the reach of the driver. The agents asked the driver, identified as William Wade Green, to step out of the Ford truck. Police officer Chantrell began a patdown of Green and immediately noticed a wad of money and another knife in Green's right boot. The officers felt a wad in Green's other boot but did not remove it. When Officer Chantrell pulled out the money and the knife, he asked Green what they were. Green said that he had come from Midland and that he was going to buy a "Harley."

Green was then turned over to the custody of the DEA. Green was advised of his rights by the DEA agents who explained why Green was under arrest. Green acknowledged that the $10,000 was his money and that he had an additional $13,000 in his other boot. Green said that he was finished talking. The $23,000 that Green had was part of the $25,000 provided by SA Martinez to Carrillo (verified by matching the serial numbers).

Perez and Rodriguez were seen leaving Room 240 at the Motel 6. The Chevrolet Celebrity that had been used to transport the cocaine earlier was found parked in the parking lot. Perez and Rodriguez were arrested. Rodriguez was found to have in his possession $500 of the money that had earlier been provided to Carrillo. After being advised of his rights, Perez gave a statement in which he said that he was being paid $250 per kilogram by Green.

Carrillo was arrested at the Pizza Hut where he was with SA Martinez and the C.I. Carrillo had with him $500 of the $25,000 that had been given to him by the agent for the eight kilograms of cocaine. It was later determined that the Chevrolet Celebrity used to deliver the cocaine was registered to Rodriguez.

## DISCUSSION

The Defendant, Green, seeks to suppress the marked money found in his boot and any other evidence seized as a result of the illegal stop and search prohibited by the Fourth Amendment.

The Fourth Amendment analysis is well established: was there a search that invokes the Fourth Amendment; was the search objectively reasonable; and, if not, should the evidence be excluded as a "fruit of the poisonous tree". *Cf. Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). The touchstone of the Fourth Amendment is reasonableness. *Florida v. Jimeno*, 500 U.S. 248, 249, 111 S.Ct. 1801, 1803, 114 L.Ed.2d 297 (1991), *citing Katz v. United States*, 389 U.S. 347, 360, 88 S.Ct. 507, 516, 19 L.Ed.2d 576. Only those searches which are unreasonable are proscribed by the Fourth

Amendment. *Illinois v. Rodriguez*, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990).

Before *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), any restraint on the person amounting to a seizure for the purposes of the Fourth Amendment was invalid unless justified by probable cause. *Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 1324, 75 L.Ed.2d 229 (1983), *citing Dunaway v. New York*, 442 U.S. 200, 207–209, 99 S.Ct. 2248, 2253–2254, 60 L.Ed.2d 824 (1979). "Terry created a limited exception to this general rule: certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a person has committed or is about to commit a crime." *Royer*, 460 U.S. at 498, 103 S.Ct. at 1324. A stop must not last any longer than necessary to effectuate the purposes of the stop. *Royer*, 460 U.S. at 499, 103 S.Ct. at 1325. The officers' actions must be objectively justifiable when viewed in light of the totality of the circumstances. *United States v. Tellez*, 11 F.3d 530, 532 (5th Cir.1993), *citing United States v. Wangler*, 987 F.2d 228, 230 (5th Cir.1993).

The Government argues that where "reasonable articulable suspicion" of criminal activity exists, law enforcement officers may conduct an investigatory detention. *Terry*, 392 U.S. at 21, 88 S.Ct. at 1880. The Government contends that the totality of the information available to the agents and the police, i.e. the identification of the truck as one used by narcotics traffickers, the possibility that the truck could have contained narcotics, the rate of speed at which the truck was traveling on the interstate and the fact that the truck was making evasive maneuvers, rendered the stop valid. However, the Government's argument centers wholly on the truck and "the identification of the truck" rather than the identification of the driver. It is the driver of the truck, and not the truck, who is protected by the Fourth Amendment's prohibition against unreasonable searches and seizures. The driver of the truck had been seen by the officers when he stepped out of the truck at the scene of the fender bender on Mesa. He could not be identified as one of the people already known to be involved in the drug deal. The Govern-

ment's assertion that "where 'reasonable articulable suspicion' of criminal activity exists, law enforcement officers may conduct an investigatory detention" is a correct statement of the law; however it does not go far enough. As stated above, certain seizures are justifiable under the Fourth Amendment if there is articulable suspicion that a *person* has committed or is about to commit a crime. *Royer*, 460 U.S. at 491, 103 S.Ct. at 1324. There was no reasonable articulable suspicion that *this* Defendant had committed or was about to commit a crime; therefore, the stop violated the Defendant's Fourth Amendment right to be free from unreasonable searches and seizures. The fact that the officers saw a knife within reach of the driver after they stopped the vehicle does nothing to change the nature of the initial unreasonable stop.

It is accordingly ordered that Defendant's Motion to Suppress Evidence be GRANTED.