OPINION
This appeal stems from the state's appeal of the Montgomery County Common Pleas Court's grant of defendant, Lisa Edwards' pre-trial suppression motion. Edwards' indictment for drug abuse is stayed pending the outcome of this appeal pursuant to Crim.R. 12(J).
On January 18, 1999, Officers Shirley Rockwell and Madeline Christopher of the Dayton Police Department were on routine patrol in the city's Fifth District when they observed the defendant walking down the middle of the Edgewood Avenue in a staggering motion. (Tr. 5).
Rockwell testified that Officer Christopher stopped the cruiser, and she rolled down the passenger window and asked the defendant if she had any identification on her. Ms. Edwards stated she did not. At this point, Officer Rockwell testified she exited the cruiser and asked Ms. Edwards if she realized she was walking in the middle of the street.
Rockwell testified the defendant told her she was walking in the middle of the street because there was ice on the sidewalk. Rockwell stated there was ice on the street but not on the sidewalk. (Tr. 6). Rockwell then testified as follows:
 So at this time I stated — I said, "I'm going to pat you down, put you in my cruiser, find out who you are." And she put her hands out, and I started — she had a bulky coat on, so I started patting down her arms, and when I got to her left hand, she had a crack pipe right in her hand.
Q. Was the crack pipe obviously in plain view?
 A. It was sticking right out of her coat sleeve. (Tr. 6).
Officer Rockwell stated that she believed Edwards was jaywalking because the sidewalk on Edgewood was clear of ice that would require a person to walk in the street. She stated she was going to place Edwards in the back of the cruiser to find out who she was. She stated she patted Edwards down for her safety to make sure she did not enter the cruiser with a weapon on her. (Tr. 7). She then testified as follows:
 Q. Alrighty [sic]. Now, when she indicated she didn't have any identification, what did you do at that point? Then you patted her down and placed her in the cruiser?
 A. After I found the crack pipe. That was an arrestable offense at that time.
 Q. And did you then continue to check any information as to — Did she give you a name? Did she tell you who she was or where she lived?
A. She did.
Q. Did you —
 A. Prior to when I found the crack pipe, I had — also at this time I felt in her coat pocket. I found a pack of Newport cigarettes. It was open, and I took those out and handed them to Officer Christopher, and — along with the crack pipe — and then she was placed in the back seat of the cruiser.
 Q. Officer, did you yourself do any field tests for the substance found or for the crack pipe itself?
 A. At that time we called another crew for a certified reagent for testing, and the crew, Darrell Herron, arrived to the scene; and he tested the crack pipe, which testified positive.
 Q. And after the results of the crack pipe were known to you, what did you do at that point?
A. At this time she was placed under arrest.
Q. For?
A. For the crack pipe.
Q. For possession of paraphernalia?
A. Right, and the positive field test.
 Q. Alrighty [sic]. Can you tell the Court what happened at that point?
 A. Well, I had placed the crack pipe inside the pack of cigarettes that was in the front seat at this time. I placed the crack pipe inside the cigarette pack, and she was taken down to the jail and booked in; and then when I went to go put the crack pipe in the property room, checked the cigarette pack, and in the bottom of the cigarette pack were two clear vials of suspected crack cocaine; and those were tagged and placed in the property room, and a lab. Analysis submitted.
 Q. Were the two gel capsules that you found at that time field-tested?
A. No, I'm not certified.
 Q. Okay, but they were submitted to the Miami Valley Regional Crime Laboratory for analysis?
A. That's correct.
Q. Do you know what the results of that test showed?
A. It showed positive for crack cocaine.
 Q. All right. Officer, did you at any point in time mirandize the defendant?
A. No, I did not.
(Emphasis ours).
On cross-examination, Officer Rockwell conceded that the information given her by the defendant did check out on the police computer in the vehicle.
Officer Christopher testified and corroborated the testimony of Officer Rockwell. She testified she witnessed Officer Rockwell conduct the pat-down of the defendant. Christopher testified as follows:
 Q. And at the time of the pat-down nothing was found on or removed from the defendant other than the crack pipe. Is that accurate?
 A. Crack pipe, and a package of cigarettes, and cigarette lighter.
Q. Those were removed from the defendant?
A. They were inside her coat pocket, yes.
 Q. You took them out of her coat pocket and did something with them?
 A. They were removed from the coat pocket and placed in the cruiser.
 Q. Is there some reason why you did that? I mean these weren't weapons, obviously.
 A. No, they were not, but I have found on several occasions there's been contraband placed in cigarette packages or inside the cigarettes themselves.
 Q. Okay, but you in fact did not inspect the cigarette package to see if there was contraband in it, did you?
A. No, not at that time.
 Q. You indicated that you had some conversation with the defendant when she asked about what was gonna be happening to her. Did you have any other conversation with her?
A. That's all that I recall.
 Q. Did you run the defendant's information on the KDT?
A. Yes.
Q. And that all came back accurate?
A. Yes.
 Q. You said another crew responded to the scene. Can you remember who that was?
 A. Sure, it was Officer Herron from the Third District.
Q. And he — Is it a he?
A. Yes, it is.
Q. And he tested the crack pipe?
A. That's correct.
 Q. And it was at that point the decision was made to arrest the defendant?
A. That's correct.
In granting the defendant's suppression motion the trial court determined that the frisk of the defendant was not justified by a reasonable suspicion that she was armed and dangerous. The trial court also noted that the "frisk" was not justified as a search incident to arrest. The court stated the following:
 However, there are a limited number of circumstances where a suspect may be frisked without a showing of reasonable suspicion that he is armed or dangerous by the officer performing the frisk or the presence of a valid arrest. One such rare exception is set out by the Ohio Supreme Court in State v. Evans.
In Evans, a driver of a motor vehicle lawfully stopped for a burned-out headlight was ordered out of his vehicle after he failed to produce a driver's license or identification. Under Ohio law, the Defendant could be arrested for failing to produce a driver's license if he could not produce a satisfactory form of identification. The Defendant was detained for the purpose of verifying his driver's license and the car owner's identity, and was frisked before being placed in the back of a police cruiser. A large roll of money and a small pack of cocaine were found in the Defendant's pocket and seized. In upholding the validity of the frisk and the seized evidence, the Ohio Supreme Court stated that "a driver of a motor vehicle may be subjected to a brief pat-down search for weapons where the detaining officer has a lawful reason to detain the driver in the patrol car." Id. at 410. The lawful reason for in-car detainment in Evans
was verifying the existence of the Defendants driver's license and ownership of the vehicle he was driving. The question presented by the current case is whether the rule set out in Evans is applicable to a situation where a pedestrian stopped for a non-arrestable offense such as jaywalking is frisked for the purpose of being placed in the police cruiser after failing to produce any identification. This Court holds that the Evans "lawful reason" principle does not justify the frisk of the Defendant in this case. Evans clearly involved an arrestable offense. However, absent very narrow exceptions set forth in O.R.C. 2935.26(A) jaywalking is not an arrestable offense. State v. Jones 1999 WL76817, 1. Furthermore, the Second District Court of Appeals for Ohio has held that, absent a valid exception, an arrest for jaywalking constitutes an unreasonable seizure under the Constitutions of both the United States and Ohio, and any subsequent evidence obtained after the unlawful arrest is subject to the exclusionary rule and is inadmissible. Id.
 The Defendant was not arrested for jaywalking in this case. Furthermore, the Second District Court of Appeals for Ohio has held that, absent a valid exception, an arrest for jaywalking constitutes an unreasonable seizure under the Constitutions of both the United States and Ohio, and any subsequent evidence obtained after the unlawful arrest is subject to the exclusionary rule and is inadmissible. Id. The Defendant was not arrested for jaywalking in this case. Furthermore, under the circumstances, the Defendant could not have been arrested for jaywalking. O.R.C. 2935.26(A)(2) allows an arrest for jaywalking if the offender cannot or will not produce sufficient evidence of her identity which checked out when run through the police cruiser's on-board computer. The other circumstances which justify an arrest for a minor misdemeanor, such as having failed to previously appear in court when cited or the offender being a danger to themselves, are not present here. The State therefore cannot rely on the fact that the Defendant was subject to arrest in justifying the frisk and cruiser-detention in this case.
 Furthermore, the State has failed to supply any other justification for placing the Defendant in the back of a police cruiser and frisking her prior to doing so after the Defendant was stopped for a non-arrestable offense. The testifying officers did not articulate any legitimate reason why it was necessary to place the Defendant in the cruiser while her information was verified. Indeed, this Court feels that allowing such pat-down and detention tactics when a non-arrestable offense is involved clearly subverts the protection against unreasonable searches and seizures embodied in the United States and Ohio Constitutions. If the officers in this case were on foot or on bicycles instead of a cruiser, it is hardly imaginable that a pat-down of the Defendant under these circumstances would be permissible before the Defendant's information was verified via police radio. Detention would also be impossible. It is highly unlikely that the bicycle-mounted officers would have radioed for a cruiser to supply a detention area while the jaywalker's information was verified. In short, this court can find no "lawful reason" why the Defendant could be lawfully patted down and detained in a police cruiser after being stopped for a non-arrestable jaywalking offense when she clearly provided satisfactory evidence of her identity. Therefore, this Court finds that the frisk of the Defendant was unlawful and any evidence obtained as a result of the search must be suppressed as "the fruits of the poisonous tree." Wong Sun v. United States (1962). 371 U.S. 471.
The State contends the trial court erred in suppressing the crack cocaine because the frisk of the defendant was justified and the evidence was found after a lawful arrest of the defendant. We agree.
Although neither police officer articulated the weather conditions as a reason for placing the defendant in the police cruiser while her identity was verified, we cannot say such action was objectively unreasonable in light of the weather conditions prevailing at the time the defendant was stopped. In State v.Evans (1993), 67 Ohio St.3d 405, the Ohio Supreme Court held that the driver of a motor vehicle may be subjected to a brief pat-down search for weapons where the detaining officer has a lawful reason to detain the driver in a patrol car.
 Other courts have relied on Mimms in holding constitutional a police officer's additional
order that the driver be seated in the patrol car. See State v. Mertz (N.D. 1985), 362 N.W.2d 410, 413, where the Supreme Court of North Dakota held that this "additional increment of intrusion" into a driver's personal liberty "does not outweigh public-policy concerns for the safety of police officers and in North Dakota, with its varying weather conditions, concerns for the protection of both the officer and driver." See also, United States v. Manbeck (C.A.4, 1984), 744 F.2d 360, 377-378.
67 Ohio St.3d at 408.
The need to place the defendant in the patrol car while her identification was being checked justified the frisk of her person. During the frisk Officer Rockwell observed in plain view the crack pipe. At that point Officer Rockwell had probable cause to arrest Ms. Edwards for possession of drug paraphernalia, a misdemeanor of the fourth degree. See, R.C. 2925.14(C)(1).
The fact that the officers did not arrest the defendant until Officer Herron arrived on the scene with his field kit and verified the presence of cocaine in the pipe is unimportant. InFlorida v. Royer (1983), 460 U.S. 491, where an officer testified at the suppression hearing that there was not probable cause, the Supreme Court concluded that "the fact that the officers did not believe there was probable cause and proceeded on a consensual or Terry-stop rationale would not foreclose the State from justifying Royer's custody by proving probable cause." Id. at 507.
Since the defendant could have been immediately arrested for the drug paraphernalia offense it was certainly reasonable to detain her to determine whether the crack pipe actually contained crack.
It is clear that Ms. Edwards was not going anywhere until the police officers verified whether the pipe contained crack. The fact that the cigarette pack was seized by the police officer before the defendant was arrested is also of no moment. The cigarette pack would have been inevitably seized and searched along with the defendant's other personal effects at the jail as part of routine booking procedures
 Indeed, both officers testified such an inventory search at the jail revealed the presence of the cocaine in the cigarette pack.
Following a lawful arrest, it is reasonable for police to search the personal effects of the arrestee as a part of routine booking procedures. State v. Miley (Nov. 9, 1989), Cuyahoga App. No. 56168, unreported, citing Illinois v. Lafayette (1983),462 U.S. 642; and State v. Caponi (1984), 12 Ohio St.3d 302, cert. denied (1984), 469 U.S. 1209. Where a routine inventory search would inevitably lead to the discovery of certain evidence, the trial court should not suppress that evidence notwithstanding police error or misconduct. Miley, supra.
The "inevitable discovery" exception to the exclusionary rule permits the state to introduce evidence that would have been discovered by lawful means, without reference to police error or misconduct. Nix v. Williams (1984), 467 U.S. 431; State v.Perkins (1985), 18 Ohio St.3d 193.
The appellant's assignment of error is sustained; the judgment of the trial court is Reversed and Remanded for further proceedings.
GRADY, P.J,. and FAIN J., concur.
Copies mailed to:
R. Lynn Nothstine
Arvin S. Miller
Hon. David Sunderland