OPINION
Plaintiff-appellant, the state of Ohio, appeals a Preble County Court of Common Pleas decision granting a motion to suppress evidence obtained during a traffic stop involving defendant-appellee, Joseph L. Taylor.
During a traffic stop, a search of a vehicle owned and driven by Taylor resulted in the discovery of a large amount of marijuana. Taylor was indicted on charges of possession of marijuana, a felony of the second degree and possession of criminal tools, a felony of the fifth degree. Taylor pled not guilty to the charges and moved the trial court to suppress evidence obtained as a result of his traffic stop.
The following facts were presented at a motion to suppress hearing:
Chris Coverstone, the primary witness at the motion to suppress hearing, testified that he has been an Ohio State Highway Patrol trooper for three and one-half years. At the time of the traffic stop at issue in this case, Coverstone was a member of the Traffic Drug Interdiction Team and had completed specialized training, which included training specifically addressing tractor-trailers. He testified that he has had twenty-three felony drug seizures during his career.
On October 25, 2000, Coverstone was stationed on Interstate 70 observing traffic when he saw a semi tractor-trailer following too closely to another vehicle. As the tractor-trailer went by, Coverstone noticed that it did not have any US-DOT or ICC numbers. Moreover, in the place where a company's name is customarily displayed there was duct tape. In very small print on this duct tape were the words "Not for hire." Coverstone decided to pull out and follow the tractor-trailer. Coverstone then observed that the trailer was "slightly out of alignment" in that the rear axles were "off to the right." Coverstone testified that this misalignment "can be dangerous when a tractor-trailer goes around a turn in a city."
Subsequently, Coverstone initiated a traffic stop of Taylor's tractor-trailer, and Taylor pulled over onto the right berm. The traffic stop began at 1:50 p.m. Coverstone exited his patrol car and walked up to the right side of the tractor-trailer. Coverstone testified that Taylor "immediately jumped out the passenger door, which was * * * unusual for a truck driver." Coverstone explained that "[a]ny time I've had a truck driver come out the passenger door, it is usually something in the truck that he didn't want me to see. Usually [the truck drivers] will sit in there and wait for you to come up to them."
Coverstone asked Taylor for his driver's license and explained the reasons why he had been stopped. Taylor admitted that he had noticed that his tractor-trailer had been out of alignment. Coverstone asked Taylor where he was traveling from, and Taylor answered that he had come from Mesa, Arizona. Coverstone noticed that Taylor was "kind of looking down and away from me, not making good eye contact" during their conversation.
Coverstone asked Taylor what he was hauling in the tractor-trailer, and Taylor replied, "Nothing, just my tools and my bike." Coverstone testified that through his training he knew that owner-operated tractor-trailers do not usually travel empty, especially from such a great distance, because it is not cost effective. Coverstone testified that the average cost for operating a tractor-trailer is $1 to $1.50 per mile.
Taylor explained that he had traveled to Indianapolis, Indiana to pick up some belongings out of a storage unit. Taylor stated that the storage facility in Indianapolis had been closed when he stopped by and that he was traveling on to Pennsylvania to pick up a friend and his belongings. Taylor said that his friend's car had broken down.
Coverstone asked Taylor for his registration and logbook. Taylor then asked, "Officer, can we go back to your car for this?" Coverstone testified that this "threw another red flag up to me because I've never in the three and a half years I've been stopping semis had had a semi-driver ask me to go back to my patrol car."
Taylor got his logbook, and Coverstone called dispatch to request the assistance of Trooper Darrin Fussner and his canine unit. Coverstone asked Taylor for his driver's license. Coverstone testified that when Taylor gave him the driver's license his hands were "very visibly shaking." Coverstone asked Taylor whether he was carrying any weapons, and Taylor replied that he had a pocketknife. Taylor handed Coverstone the pocketknife and was told that it would be returned "when we were done with the stop."
Taylor sat in the back of the patrol car. He told Coverstone that he had left Mesa on Saturday. This was Wednesday. Coverstone asked Taylor about where he had been in Indianapolis. Taylor stated that he had been at "465 and 32." Coverstone further testified:
I said, "But where in Indianapolis?"
 And he looked at me and said, "I know what you are talking about," with a blank stare on his face.
 It appeared to me that he couldn't think up an answer quick enough to tell me where exactly he was in Indianapolis. I once again came back and asked him where exactly were you in Indianpolis.
 And at that point he told me that he had stopped at a hotel in Indianapolis at 465 and 32.
 Coverstone testified that, once again, this did not seem to be normal behavior because the truckers he had encountered slept in their trucks during trips across the country instead of paying for a hotel.
When asked, Taylor said that in Pennsylvania he was picking up his friend's motorcycle, couch, bed, dresser, and clothes and that he and his friend were going to drive back to Arizona, where his friend was going to help him with his trucking business. Coverstone asked Taylor for the address of his friend in Pennsylvania. At first, Taylor said, "Well, I just know how to get there." Then Taylor said, "Well, I have his phone number. When I get close, I'm going to meet him."
At about 1:58 p.m., Fussner arrived with his drug dog, Buckeye. Coverstone testified that Taylor "fixed his gaze on the dog and [Fussner] and continued to watch him as Fussner walked him up the right side of the tractor-trailer. It was like he focused in on that dog."
Coverstone asked Taylor how long he had owned the tractor-trailer. Taylor said that he had owned it for about a month, and Coverstone noted that it had been registered on October 13. Coverstone testified that in his drug interdiction training, he had learned that it was the current practice of many of the owner-operators who were carrying drugs to change their company names quite frequently.
While Fussner was walking his dog around the tractor-trailer, Coverstone called his post to check on Taylor's driver's license and requested a criminal history. From these requests, Coverstone learned that Taylor's license was valid and that Taylor only had a criminal damaging conviction in Arizona. Coverstone reviewed Taylor's logbook and noticed that the first few pages had been torn out. Taylor said that a Texas trooper had stopped him recently and told him that he needed to run a logbook. At that time, Taylor began running a logbook. Coverstone testified that it was "a little odd" that the first few pages were missing and the times in the book did not correspond to Taylor's statements about when he left Mesa.
While Fussner was walking Buckeye around the tractor-trailer, Taylor told Coverstone that he was going to take his tractor-trailer and drive back to Indianapolis to get its alignment repaired. Again, this statement surprised Coverstone because that would require Taylor to drive in the opposite direction of the way he had been traveling.
Coverstone called El Paso Intelligence Center ("EPIC") to request a check of Taylor, his registration plates, and the company name. The EPIC check indicated that there was no record involving Taylor, his registration plates, or company name. At that point, Coverstone talked to Taylor about how his following too closely and explained what the proper distance Taylor should have allowed between his tractor-trailer and the vehicle ahead of him.
Although Fussner walked Buckeye around the tractor-trailer several times, the dog failed to alert. Coverstone wrote Taylor a written warning for following too closely and told him that he was "free to go." Coverstone asked Taylor whether he had any questions, and Taylor asked for his pocketknife. Coverstone returned the pocketknife and Taylor asked him a few questions about getting his tractor-trailer repaired. Coverstone then asked Taylor if he could ask him a question, and Taylor said yes. Coverstone asked if Taylor had any weapons, large sums of money, marijuana, cocaine, methamphetamine, or heroin in the tractor-trailer. Taylor said, "no," to each of these questions, but the trooper noticed that when asked about cocaine, Taylor looked away from him and said, "Nothing like that." Coverstone testified that "based upon [Taylor's] reactions to the cocaine question, I thought there was a possibility there could be cocaine in there because that was the only question he changed his body language on."
Coverstone asked Taylor if he could search the tractor-trailer and Taylor said he could. Taylor then said something like, "I got into some shit awhile ago, but not into it anymore." Coverstone took a written consent form from his patrol car and Taylor signed it, after Coverstone read him the bottom part of the form that addresses the right to refuse consent and the right to refuse to sign the form. Coverstone observed Taylor's hands shaking as he signed the consent form. Fussner witnessed the signing of the consent form. The form was signed at about 2:13 p.m., which was slightly more than twenty minutes after the initial stop had occurred. Coverstone testified that he would have attempted to obtain a search warrant if Taylor had refused to consent to the search. Coverstone explained that he would have taken Taylor to a truck stop and told him that he was going to try to get a search warrant.
Coverstone began his search of the tractor-trailer by looking in the front seat of the tractor, where he found a large machete and suitcases with airline tags on them. In the side boxes of the tractor, Coverstone found hand tools, a portable saw, a portable drill, rivet guns, and rivets, things which, according to Coverstone, you do not normally see in a tractor-trailer unless there is work being done on the inside of the trailer.
Coverstone unlocked the trailer with a key that he had seen in the tractor, and opened it. He noticed that the inside of the trailer had been freshly re-paneled. Coverstone also saw a three-wheeler and a ladder in the front of the trailer.
At that point, Coverstone obtained a drill from his patrol car, walked to the trailer's front wall, and began drilling. After drilling through the wall, he pulled the drill bit out. Coverstone smelled the drill bit and determined that it smelled like marijuana. Coverstone jumped down from the trailer, handcuffed Taylor, and advised him of his Miranda rights.
Fussner put Buckeye inside of the trailer and the dog alerted on the front wall of the trailer. Coverstone testified that it is often difficult for drug dogs to alert on the outside of tractor-trailers because there are few air openings in these trailers.
Initially Taylor denied knowing about any drugs in his tractor-trailer. Eventually Taylor wrote and signed a confession, in which he admitted that he had been hired to transport contraband.
Following the hearing, the trial court granted the motion to suppress. The state appealed, raising two assignments of error, which we will consider together:
Assignment of Error No. 1:
 THE TRIAL COURT ERRED TO THE PREJUDICE OF PLAINTIFF-APPELLANT IN RULING THAT APPELLEE HAD BEEN ILLEGALLY DETAINED.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED IN FINDING THAT APPELLEE'S CONSENT TO SEARCH THE VEHICLE WAS NOT VOLUNTARY.
When considering a motion to suppress, the trial court is the primary judge of the credibility of witnesses and the weight of the evidence.State v. Fanning (1982), 1 Ohio St.3d 19, 20. If the trial court's findings are supported by competent and credible evidence, then the appellate court must accept them. State v. Williams (1993),86 Ohio App.3d 37, 41. Relying on the trial court's factual findings, the reviewing appellate court determines "without deference to the trial court, whether the court has applied the appropriate legal standard."State v. Anderson (1995), 100 Ohio App.3d 688, 691.
The initial stop of Taylor's tractor-trailer was warranted. Coverstone initiated the traffic stop after observing that the tractor-trailer was following too closely to the vehicle ahead of it, which is a violation of R.C. 4511.34.[1] Where a law enforcement official has probable cause that a traffic violation has occurred or is occurring, a traffic stop is justified. See Dayton v. Erickson (1996), 76 Ohio St.3d 3, syllabus;State v. Wilhelm (1998), 81 Ohio St.3d 444.
In its judgment entry, the trial court found that although the initial traffic stop was valid, Taylor's detention became illegal once the drug dog failed to alert, if not earlier. The trial court reasoned that once the drug dog failed to alert, the troopers did not have reasonable, articulable suspicion to continue to detain Taylor and the investigation should have ended. Applying State v. Robinette (1997), 80 Ohio St.3d 234, and State v. Retherford (1994), 93 Ohio App.3d 586, the trial court found that Taylor's consent was not valid and that the contraband obtained from the search of his tractor-trailer should be suppressed.
In its assignments of error the state contends that, contrary to the findings of the trial court, Taylor was not illegally detained and his consent to search was voluntary. As we will explain below, we agree. However, as we will also explain, the search of the tractor-trailer exceeded the scope of Taylor's consent, and therefore the decision to grant the motion to suppress must be upheld, although for reasons other than there given by the trial court.
The Fourth Amendment to the United States Constitution and Section 14, Article I of the Ohio Constitution guarantee "[t]he right of the people to be secure in their persons, houses, papers, and effects,[2] against unreasonable searches and seizures shall not be violated * * *." Section14, Article I of the Ohio Constitution has been interpreted as providing protections that are coextensive with those provided by theFourth Amendment to the United States Constitution. Robinette,80 Ohio St.3d at 239.
"The touchstone of our analysis under the Fourth Amendment is always the reasonableness in all the circumstances of a particular governmental invasion of a citizen's personal security." State v. Lozada (2001),92 Ohio St.3d 74, 78. When determining the reasonableness of a particular police procedure we must "balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Id.
A search conducted without a warrant supported by probable cause isper se unreasonable, subject only to a few well-established exceptions.Schneckloth v. Bustamonte (1973), 412 U.S. 218, 219, 93 S.Ct. 2041,2043. A consensual search is one of the exceptions to this rule. Id.,412 U.S. at 219, 93 S.Ct. at 2043-44.
Where a law enforcement officer conducts a warrantless search, the state bears the burden of establishing the validity of the search. Statev. Arrington (1994), 96 Ohio App.3d 375, 377, citing Coolidge v. NewHampshire (1971), 403 U.S. 443, 454-455, 91 S.Ct. 2022, 2032. If an officer asserts that a suspect consented to a search, the state must prove that the consent was freely and voluntarily given and not the result of coercion. Arrington at 377, citing Bustamonte, 412 U.S. at 248-249,93 S.Ct. at 2059. Voluntariness is a question of fact to be determined from all of the circumstances. Robinette, 80 Ohio St.3d at 243, citingBustamonte, 412 U.S. at 248-249, 93 S.Ct. at 2059. The burden of demonstrating that consent has been freely and voluntarily given requires more than showing "a mere submission to a claim of lawful authority."Robinette at 243, quoting Florida v. Royer (1983), 460 U.S. 491, 497,103 S.Ct. 1319, 1323-1324.
As stated above, in its decision to sustain the motion to suppress, the trial court relied heavily on State v. Robinette (1997), 80 Ohio St.3d 234. In that case, Robinette was stopped by a sheriff's deputy for speeding in a construction zone. Robinette at 235. The deputy gave Robinette a verbal warning and "without any break in the conversation * * * then asked Robinette, `One question before you get gone [sic]: are you carrying any illegal contraband in your car?'" (Emphasis sic.) Id. at 243. Then the deputy asked Robinette whether he could search Robinette's vehicle. Id. Robinette "hesitated, looked back at his car, then back at the officer, then nodded his head." Id. The deputy conducted a search and discovered some marijuana and a pill. Id. Robinette was charged with drug abuse and filed a motion to suppress the evidence obtained in the search of his vehicle. Id. at 235.
The Supreme Court of Ohio ruled that the deputy was justified in briefly detaining Robinette to ask him whether he was carrying any contraband pursuant to the drug interdiction policy, "because such a policy promotes the public interest in quelling the drug trade."Robinette at 241. Next, the court reviewed whether it was lawful to further detain Robinette after he denied having any contraband. The court held that if during the initial detention, an officer observes "reasonably articulable facts giving rise to a suspicion of criminal activity, the officer may then further detain and implement a more in-depth investigation of the individual." Id. The court determined that the deputy did not have reasonable articulable facts or individualized suspicion to justify Robinette's further detention or to ask to search his car. Id. The court reasoned that where there are no articulable facts that give rise to a suspicion of illegal activity the continued detention constitutes an illegal seizure. Id. at 240.
The Robinette court then stated, "[o]nce an individual has beenunlawfully detained by law enforcement, for his or her consent to be considered an independent act of free will, the totality of the circumstances must clearly demonstrate that a reasonable person would believe that he or she had the freedom to refuse to answer further questions and could in fact leave." (Emphasis added.) Robinette, 80 Ohio St.3d at paragraph three of the syllabus. The court concluded that Robinette "merely submitted to `a claim of lawful authority' rather than consenting as a voluntary act of free will, id. at 245, and found that the motion to suppress should be granted. Id. at 246.
The facts of Robinette are different from the circumstances of the case presently under review. In Robinette, the deputy "did not have any reasonable articulable facts or individualized suspicion to justify Robinette's further detention * * *." Robinette at 241. In contrast, Coverstone testified that he observed several irregularities during the traffic stop that raised suspicion of illegal activity: on the tractor, duct tape covered the area where a business name is customarily displayed and there were no US-DOT or ICC numbers, Taylor's logbook was incomplete, he had difficulty articulating where he was traveling from and where he was traveling to, he was nervous, and he jumped out of the tractor and asked Coverstone if they could go to the patrol car. In addition, Taylor was driving across the country with a trailer that was practically empty and told Coverstone that he had stayed overnight at a hotel rather than sleeping in his truck. Coverstone testified that drawing on his training and experiences as a highway trooper, he realized that Taylor was acting in several ways that were uncharacteristic of the typical truck driver. "A court reviewing the officer's actions must give due weight to his experience and training and view the evidence as it would be understood by those in law enforcement." State v. Andrews
(1991), 57 Ohio St.3d 86, 88, citing United States v. Cortez (1981),449 U.S. 411, 101 S.Ct. 690. We find that there were sufficient reasonably articulable facts giving rise to a suspicion of criminal activity to allow Coverstone to detain Taylor and implement a more in-depth investigation. A continued detention of Taylor to further investigate was justified.
Moreover, we find that in fact Taylor was not being detained by Coverstone at the time Taylor consented to the search of his tractor-trailer. Again, the facts of Robinette are different from the case before us. Robinette was asked, "One question before you get gone
[sic]: are you carrying any illegal contraband in your car?" (Emphasis added.) Robinette, 80 Ohio St.3d at 243. The deputy initiated this questioning immediately after Robinette had been given a verbal warning for his traffic violation. The deputy's words indicated that Robinette's freedom to leave was conditioned upon his response to this final question. The Robinette court stated that the deputy's words "did not give Robinette any indication that he was free to go, but rather implied just the opposite that Robinette was not free to go until he answered [the deputy's] additional questions." Id. at 244.
In the case now before us, after Taylor received a written warning, he was told that he was "free to go." Coverstone asked Taylor whether he had any further questions, and Taylor asked a few questions. After answering these questions, Coverstone asked whether he could ask Taylor a question, and Taylor said yes. At that time, Coverstone asked Taylor whether he had any contraband in his tractor-trailer. Taylor denied that he had any type of contraband. Then Taylor was asked whether he would consent to a search of his tractor-trailer.
Taylor chose to remain with Coverstone to ask a few questions. Taylor also chose to answer Coverstone's questions. Unlike the facts inRobinette, in this case Taylor was told that he was free to leave but remained and initiated further discussion with Coverstone. The supreme court has stated that where a police officer informs a person that he "does not have to answer further questions and is free to leave, that action would weigh persuasively in favor of the voluntariness of the consent to search." Robinette, 80 Ohio St.3d at 245, fn. 6.
Taylor was asked to sign a consent to search form. Taylor signed a consent to search form after Coverstone read aloud the section about a person's right to refuse consent. Upon examination of these circumstances, we conclude that Taylor freely and voluntarily consented to the search of his tractor-trailer.[3]
However, we must also determine whether the search that ensued exceeded the scope of this consent. The standard for measuring the scope of a person's consent to search is one of objective reasonableness. Floridav. Jimeno (1991), 500 U.S. 248, 251, 111 S.Ct. 1801, 1803-1804. The question to ask is: "[W]hat would the typical reasonable person have understood by the exchange between the officer and the suspect?" Id.
Applying this standard, the Second District Court of Appeals has reviewed whether a defendant's consent to a search of his car extended to the removal of an interior panel. State v. Rodriguez (1992),83 Ohio App.3d 829. That court held that the typical reasonable person who had consented to a search of his car would not have understood this consent as permission to dismantle his car by using screwdrivers to remove an interior panel to search for contraband. Id. at 835. The court of appeals concluded that the defendant's motion to suppress should be granted. Id. at 835.
In the case sub judice, Coverstone did not merely dismantle an interior panel, but drilled right through it. Although Taylor consented to the search of his tractor-trailer, the scope of this consent was exceeded when Coverstone drilled through one of the tractor-trailer's interior walls. The typical reasonable person would not have understood his consent to search his tractor-trailer as permission to drill through an interior wall. This destruction of property violated Taylor's rights under the Fourth Amendment.
This court recognizes that detecting illegal drug trafficking is an important priority for law enforcement and that law enforcement officials must have some latitude in the methods they employ for searching for drugs. In our view, a law enforcement official who has determined that drilling through an interior wall would be necessary to detect the presence of illegal drugs or other contraband would be well advised to obtain a search warrant.[4] In deciding whether to issue a search warrant, an impartial judicial officer would assess whether law enforcement has probable cause to conduct such an intrusive search.
Where a trial court has stated an erroneous basis for its judgment, an appellate court must affirm the judgment if it is correct on other legal grounds, that is, it arrives at the right result for the incorrect reason, because such an error is not prejudicial. State v. Payton
(1997), 124 Ohio App.3d 552, 557. We agree with the arguments presented by the state in its assignments of error that the trial court erred by finding that Taylor was illegally detained and that his consent to search was not freely and voluntarily given. However, we hold that the search of the tractor-trailer exceeded the scope of Taylor's consent and thereby violated his Fourth Amendment rights. Therefore, the fruits of this search must be suppressed.
The trial court's granting of the motion to suppress is upheld. The state's assignments of error are overruled.
Judgment affirmed.
YOUNG, P.J., and POWELL, J., concur.
[1] In pertinent part R.C. 4511.34 states: "The operator of a motor vehicle * * * shall not follow another vehicle * * * more closely than is reasonable and prudent, having due regard for the speed of such vehicle * * * and the traffic upon and the condition of the highway.
[2] The Ohio Constitution uses the word "possessions" instead of "effects."
[3] State v. Retherford (1994), 93 Ohio App.3d 586, which the trial court also cited in its decision, is also distinguishable from the case at bar, as the facts in that case are more like the circumstances inRobinette. Like Robinette, law enforcement officials in Retherford
observed few articulable facts to raise reasonable suspicion that the defendant had contraband in her vehicle. Retherford at 601-02 (finding that facts that Retherford had placed her luggage in the back seat rather than the trunk, that she was nervous but "no more nervous that an average person stopped for a traffic violation," and that she was driving from Cincinnati to Port Clinton were not sufficient to authorize a reasonable suspicion of wrongdoing). Second, although Retherford gave a verbal consent to search, she did not read and sign a written consent form and was not told that she did not have to consent to the search. Id. at 591. Therefore, even if we were to adopt the reasoning of the Second District Court of Appeals in Retherford, it would not be determinative of our analysis of the case before us.
[4] As mentioned above, Coverstone testified that had Taylor withheld his consent to search, Coverstone would have attempted to obtain a search warrant.