[Cite as *State v. Pritchett*, 2021-Ohio-9.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

    v.                                        :

BRANDON PRITCHETT,              :

    Defendant-Appellant.      :

No. 109149

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED
**RELEASED AND JOURNALIZED:** January 7, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-19-639864-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Nora C. Bryan, Assistant Prosecuting Attorney, *for appellee.*

Paul W. Flowers Co., L.P.A., and Louis E. Grube, *for appellant.*

LARRY A. JONES, SR., P.J.:

{¶ 1} In this appeal, defendant-appellant Brandon Pritchett ("Pritchett") challenges the trial court's judgment denying his motion to suppress. For the reasons that follow, we reverse.

## Procedural History

{¶ 2} Pritchett was charged by way of information with one count of carrying a concealed weapon. He had a codefendant, Derrick Dorroh ("Dorroh"), who was charged with one count each of carrying a concealed weapon and having weapons while under disability. Pritchett and Dorroh filed motions to suppress, and a hearing was held on them.

{¶ 3} At the conclusion of the hearing, the trial court denied their motions. Both defendants entered pleas of no contest to the charges against them. Pritchett was sentenced to five years of community control sanctions, with conditions. The trial court also imposed a $5,000 fine, which would be reduced to $1,000 if Pritchett paid the court costs before October 1, 2021. Pritchett now appeals, raising the following sole assignment of error for our review:

> The trial court erred as a matter of law by denying the defendant's motion to suppress evidence.[1]

## Facts Adduced from Suppression Hearing

{¶ 4} On May 7, 2019, the Cleveland police recovered a gun from Pritchett's backpack; Pritchett did not have a concealed weapon permit. In his suppression motion, Pritchett contended that the gun had been obtained through an illegal search and seizure in violation of the Fourth Amendment to the United States Constitution. The state filed a brief in opposition to Pritchett's motion, in which it contended that Pritchett consented to the search by voluntarily, and without having

---

[1]Codefendant Dorroh has also filed an appeal, which is pending as a companion to this case. *State v. Dorroh*, 8th Dist. Cuyahoga No. 109158.

been prompted, handing his backpack to the police; the state maintained that position at the hearing and continues to maintain it in this appeal.

{¶ 5} The facts of this case are adduced from the one witness the state presented at the suppression hearing — Officer Rabee Nasser ("Officer Nasser") — and the documentary evidence derived from Officer Nasser's body camera that was admitted into evidence.

{¶ 6} At approximately 4:00 a.m. on the day in question, Officer Nasser, as well as other officers, responded to a "code 1" call regarding two males who were attempting to break into a PNC Bank ATM at 10900 Lorain Ave., Cleveland, Ohio. A description of both males was given, including that they had backpacks. The officer testified that code 1 is the highest priority call. Officer Nasser was nearby and able to promptly respond. The record shows that Officer Nasser and his partner were the first on the scene, and shortly thereafter two other officers responded as well; thus, there were four officers on the scene.

{¶ 7} Upon arriving at the scene, Officer Nasser saw two males — Pritchett and Dorroh — who fit the description that had been given. The police approached the two. They did not have their lights or siren on, and they did not approach with drawn weapons. Officer Nasser said to Pritchett and Dorroh, "Yo, come over here. Let me see some hands"; Pritchett and Dorroh complied without incident. The police asked the defendants if they had any weapons on them, and the defendants indicated that they did not.

**{¶ 8}** Approximately one minute into the encounter, Officer Nasser said over the police radio that "we're gonna be out with them"; he asked for another officer to check the ATM. The defendants told the police that they had just finished their shift at Taco Bell and went to the ATM to withdraw money. A shirt could be seen hanging out from underneath the "hoodie" Pritchett was wearing, and Pritchett pulled the shirt out even a little more and indicated it was his work shirt. Dorroh gave the officers a sheet of paper, which he told them was his "check out sheet" from Taco Bell, and showed his PNC bank card.

**{¶ 9}** The police told them that someone called 911 stating that two men had been using tools to try to break into the ATM. The defendants denied that it was them; they maintained that they were simply withdrawing money, and Dorroh said something to the effect of the tipster just "seeing two black men with hoodies" and equating it with suspicion. The police told the defendants that if "everything checks out, y'all [will] be on your way," and it was probably just a "misunderstanding."

**{¶ 10}** A communication came over the police radio that there were three ATMs in the area and the police out in the field indicated that they would check all three. Shortly thereafter, one of the field officers radioed to the officers on the scene, asking, "Do you have any indicators with those males that you have detained?" Officer Nasser responded, "Negative." Pritchett and Dorroh reiterated to the police that they had just finished their shift at Taco Bell, and had been withdrawing money from the ATM. The police asked if they had a receipt for the transaction, and Dorroh said no, they did not get one. Officer Nasser testified that the lack of a receipt did

not raise suspicion with him; he admitted that he does not always get a receipt when he withdraws money from ATMs. Further, although Dorroh told the police that he had withdrawn $140, the police did not ask him to verify it by showing the money.

{¶ 11} One of the officers asked the defendants if they had their uniforms on. Pritchett responded, "Really?" The officers confirmed that they wanted him to show his uniform; Pritchett complied, taking off his hoodie to show his uniform with the words "Taco Bell" on it. In order to fully show his uniform shirt, Pritchett had to remove his backpack; Officer Nasser testified that he was not "alarmed" and "did not feel threatened" when Pritchett took his backpack off.[2]

{¶ 12} Meanwhile, other police officers were checking area ATMs; as mentioned, there were three in the area, including the one that was the subject of the call. During this time, communication can be heard on the police radio, some of it dealing with other police business, and some of it ostensibly dealing with the matter at hand. At times, it is difficult to hear exactly what is being said over the police radio because the defendants were talking at the same time as the communications; they were compliant with the police, but nonetheless were complaining about the stop and the tipster's call of their alleged "suspicious" activity of withdrawing money.

---

[2]Officer Nasser testified that it was not uncommon for him to do "protective area searches" when dealing with suspects; for example, he testified that he does them sometimes when he pulls people over and has reasonable suspicion they may be armed. But he did not feel the need to do one in this case.

{¶ 13} However, despite the difficulty in hearing all that was being said over the police radio, Officer Nasser testified that a communication came over the radio that there was no damage to any of the three ATMs. Specifically, the officer testified that, "Yes, I did hear that there was no damage to the ATMs because I'm the one who asked to see if there was any damage done to the ATMs." (Tr. 48.) In response to that communication, the police again told the defendants that they would soon "cut you guys loose."

{¶ 14} One of the officers in the group with Pritchett and Dorroh then radioed a sergeant who had apparently been checking the ATMs and asked, "Sarge, any damage to them ATMs?" The response was, "Given this updated information, we'll do a double check. Just verify that they don't have any tools in their possession." Officer Nasser testified that Pritchett and Dorroh visibly reacted to the statement. Dorroh began to look through his bag; the officer asked him to hand it over and he complied; nothing of significance was found in Dorroh's bag.

{¶ 15} Pritchett questioned the police: "Are we magicians though? Do you gotta see the bag now?" Pritchett started to protest, saying "I'm not gonna * * *," but then turned the bag over. The police then searched Pritchett's bag and found the gun. When asked, Pritchett told them he did not have a carrying concealed weapon permit.

{¶ 16} Pritchett and Dorroh were detained and searched, during which a gun was found in Dorroh's waistband. The defendants maintained that they carried the weapons for their safety. No tools were found in either backpack or on the

defendants' persons, a fact which one of the officers found "strange," but nonetheless confirmed that they (the police) had done the right thing. One of the officers on the scene said, "I know this is not a cut and dry case, but this is — this is like a *Terry* stop. You know, we were just investigating." However, Officer Nasser testified at the hearing that the whole encounter was consensual, and the defendants were free to leave at any time up until their bags were searched.

## The Trial Court's Findings

{¶ 17} The trial court denied Pritchett and Dorroh's motions from the bench, stating the following:

> Okay. I have played the video in my chambers twice to determine what was said, when it was said, and I don't think it's as clear as the defense would like to believe.
>
> I did hear somebody not on scene, over the radio, saying double-check them. I did not hear that all machines were clear and none were damaged. I heard that one was not damaged.
>
> I heard that there were three in that area that they were going to be checking. I never heard that all three were checked in that first eight minutes when they turned over their bags.
>
> I did see Mr. Dorroh — he started to go through his bag on his own. That's when the police officer said, for officers' safety, let me do that. Okay? I hope you all saw that. * * *. So I can — I will rule that searching Mr. Dorroh's bag was definitely allowable.
>
> Mr. Pritchett handed his bag over. Nobody asked him for it. When the officers said to Mr. Dorroh, you understand for officers' safety, let me do that — I think it's for officer's safety, let me do that, you understand, something like that — Mr. Pritchett handed his bag over. He wasn't asked for it.
>
> Whether or not [Pritchett and Dorroh] heard the radio, we don't know. There's been no testimony to that fact that they heard what was on the

radio. What I heard on the radio was, double-check them. One machine was cleared that wasn't damaged to their eye visibly.

That, to me, does not mean the investigation is over because I'm well aware of tampering with ATMs does not always provide visible damage on the outside to the onlooker. But they cleared one machine before the bags were turned over. I did not hear them clear three. So it was still an ongoing investigation.

It was a reasonable suspicion for the stop and once Mr. Dorroh started going through his bag, opening his bag and going through it, there was reasonable suspicion and [for] officer safety, both, to take that bag then and [the officer] do it himself as opposed to letting Mr. Dorroh do it.

If Mr. Dorroh had not opened his bag and started going through it, my opinion may be different; but once he opened his bag and started going through it, there is no way that officer knew what was in that bag and he had to take it from him to do officer safety.

So from that moment on, had that not happened, I would have a different ending to this story, but I have to rule that the search of the bags was permissible under the Fourth Amendment as it occurred in this case.

So your motion to suppress is denied.

## Law and Analysis

## Standard of Review

{¶ 18} A motion to suppress presents a mixed question of law and fact. *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8. When considering a motion to suppress, the trial court assumes the role of trier of fact and is, therefore, in the best position to resolve factual questions and evaluate the credibility of witnesses. *Id.* Consequently, an appellate court must defer to the trial court's findings of fact if they are supported by competent, credible evidence. *Id.* An appellate court, however, must independently determine as a matter of law, without

deference to the trial court's conclusion, whether the facts meet the applicable standard. *State v. Hill*, 8th Dist. Cuyahoga Nos. 83762 and 83775, 2005-Ohio-3155, ¶ 12.

## The Fourth Amendment

{¶ 19} The Fourth Amendment to the United States Constitution and Article I, Section 14, of the Ohio State Constitution protect against unreasonable governmental searches and seizures. *State v. Callan*, 8th Dist. Cuyahoga No. 95310, 2011-Ohio-2279, ¶ 15. Warrantless searches and seizures are considered per se unreasonable, unless an exception to the warrant requirement applies. *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).

{¶ 20} An investigative stop, or "*Terry* stop," is a common exception to the Fourth Amendment warrant requirement. *See Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). A *Terry* stop is a temporary detention of a person for the limited purpose of either conducting a pat-down of the outer clothing of a person suspected of being armed and dangerous, or investigating suspected criminal behavior. *Id.* at ¶ 24. While a *Terry* stop constitutes a seizure, it does not violate the Fourth Amendment as long as the officer has reasonable suspicion based on articulable facts that a person has committed or is about to commit a crime. *State v. Aufrance*, 2d Dist. Montgomery No. 21870, 2007-Ohio-2415, ¶ 14, citing *Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983).

{¶ 21} If an officer temporarily detains a person without reasonable suspicion, then a Fourth Amendment violation has occurred. *Aufrance* at *id.* If

evidence is obtained as a result of an illegal Fourth Amendment search or seizure, the exclusionary rule bars that evidence from being used against a defendant at trial. *Murray v. United States*, 487 U.S. 533, 536, 108 S.Ct. 2529, 101 L.Ed.2d 472 (1988).

{¶ 22} The United States Supreme Court has held, however, that "not all personal intercourse between policemen and citizens involves 'seizures' of persons." *Terry* at fn. 16. A person is not seized within the meaning of the Fourth Amendment if the police merely engage a person in a consensual encounter.

{¶ 23} A consensual encounter is a manner of contact initiated by a police officer for purposes of inquiry only. Consensual encounters do not require that a police officer have a reasonable suspicion of criminal activity before making the approach. *State v. Patterson*, 9th Dist. Summit No. 23135, 2006-Ohio-5424, ¶ 18, citing *Cuyahoga Falls v. Sandstrom*, 9th Dist. Summit No. 17000, 1995 Ohio App. LEXIS 2624 (June 21, 1995). "[M]erely approaching an individual on the street or in another public place[,]" for the purpose of asking questions that elicit voluntary, uncoerced responses, does not violate the Fourth Amendment. *State v. Boswell*, 5th Dist. Ashland No. 13-COA-018, 2014-Ohio-886, ¶ 14, citing *United States v. Flowers*, 909 F.2d 145 (6th Cir.1990). A person approached in this manner is not required to answer any question, and may choose to end the interaction at any point or decline to engage in the interaction altogether. *Boswell* at ¶ 11.

{¶ 24} In *United States v. Mendenhall*, 446 U.S. 544, 100 S.Ct. 1870, 64 L.Ed.2d 497 (1980), the United States Supreme Court listed factors to consider when determining whether an individual is engaged in a consensual encounter as opposed

to an investigatory detention by police. The factors include, "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 554. The relevant inquiry is whether, when looking at the totality of the circumstances, a reasonable person under the same circumstances would feel free to leave and end the encounter with the police. *Id.*

{¶ 25} If, however, the police initiate a lawful *Terry* stop, they must be careful not to exceed the scope of the stop's "underlying justification." *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). Additionally, the length of the stop cannot last "longer than is necessary to effectuate the purpose of the stop." *Id.*

**Analysis**

{¶ 26} Pritchett does not challenge the initial stop. His contention is that the police investigation was impermissibly prolonged. The state contended at the trial court level that the encounter was consensual. The trial court did not acquiesce to the state's contention; rather, the court found that there "was a reasonable suspicion for the stop," a finding that would not be made unless there was a *Terry* stop. The trial court's finding that a seizure had occurred was supported by competent, credible evidence in the record.

{¶ 27} Specifically, the police approached Pritchett and Dorroh saying, "Yo, come over here. Let me see some hands." The police told the two that 'if everything

checked out" they would be released — a clear implication that they were not free to leave. The police repeated that their release was conditioned on the defendants showing them their backpacks. These facts were competent, credible evidence that the defendants had been seized.

{¶ 28} But Pritchett contends that other findings made by the trial court were not supported by competent, credible evidence. First, the trial court found that the continued detention of the defendants was permissible because the information the police had on the scene was that only one ATM had been cleared. As there were two other ATMs in the area, the court reasoned that the investigation was ongoing. As mentioned, it was hard at times to hear what was being communicated over the police radio. But Officer Nasser testified that the police on the scene were told that all three ATMs had been cleared. After that clearance was given, the police were instructed to "double-check" the defendants for "tools."

{¶ 29} In light of the above, the trial court's finding that only one machine had been cleared and the investigation was ongoing was not supported by competent, credible evidence in the record.

{¶ 30} Second, the trial court found that Pritchett handed his backpack over to the police without having been asked to do so. Pritchett contends that although none of the officers used the specific words "give me your backpack," the record demonstrates that the defendants' ability to leave was conditioned on their bags being searched. We agree.

{¶ 31} The officer who was checking the ATMs, and to whom the police on the scene had been communicating with, told the police on the scene, after all three ATMs had been cleared, "Given this updated information, we'll do a double-check. Just verify that they don't have any tools in their possession." Officer Nasser testified that he was "very certain" both defendants heard that directive, because they reacted to it. Pritchett protested. He did not voluntarily hand the bag over; rather, his release was conditioned on him doing so. On this record, the trial court's finding that "Mr. Pritchett handed his bag over. Nobody asked him for it." is not supported by competent, credible evidence.

{¶ 32} Third, and as alluded to above, Pritchett challenges the trial court's finding that there was "no way to know" whether the defendants heard the sergeant's directive to the police on the scene to "Just verify that they don't have any tools in their possession." Officer Nasser testified "I'm very certain that they heard the sergeant because as soon as the sergeant said it, you could tell by their expression * * *." As such, the trial court's finding in this regard was not supported by competent, credible evidence.

{¶ 33} Because we find that the trial court made findings not supported by competent, credible evidence, we likewise find that two of its conclusions were not constitutionally sound. First, we find the trial court's finding that there was an ongoing investigation erroneous; we find that the detention of Pritchett exceeded its lawful duration and scope. The record demonstrates that the purpose of the stop was to investigate two men who allegedly were seen using tools to break into an ATM

machine. That ATM, along with two others in the area, was cleared — there were no indicators that any of the three had been tampered with. Further, there were no on-the-scene "indicators" with either Pritchett or Dorroh that gave rise to suspicion. On this record, the stop was impermissibly extended so that the scope of the investigation could be expanded without any reasonable basis.

{¶ 34} Second, we find that the search of Pritchett's backpack, without a warrant and without consent, was impermissible. At the point in the detention when the police requested Pritchett's backpack, the investigation prompted by the 911 call was over; that is, there was no evidence that any of the ATMs had been tampered with. There was no reasonable suspicion that Pritchett was armed and dangerous and he was not being searched incident to arrest. On the record before us, the search of Pritchett — as evidenced by the sergeant's command to "double- check" and "verify" that the defendants did not have any tools in their possession — was a fishing expedition. Indeed, "double-check" implies that "everything is okay," but "let's make sure." In the realm of Fourth Amendment analysis, and on this record (i.e., aside from fitting the description of the suspects, there was nothing suspicious about the defendants, they were compliant, and it was not a consensual encounter) "double-check" and "let's make sure" equate to an impermissibly prolonged stop.

{¶ 35} Based on the above, the gun found in Pritchett's backpack, and his admission that he did not have a license, was unconstitutionally obtained. We therefore find that the trial court should have granted Pritchett's motion to suppress.

{¶ 36} Judgment reversed.

It is ordered that appellant recover from appellee costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., PRESIDING JUDGE

EILEEN A. GALLAGHER, J., CONCURS;
MICHELLE J. SHEEHAN, J., CONCURS
IN JUDGMENT ONLY WITH SEPARATE
OPINION


MICHELLE J. SHEEHAN, J., CONCURRING IN JUDGMENT ONLY:

{¶ 37} I concur with the majority opinion that there was no probable cause to search Pritchett's backpack and to reverse the trial court's denial of Pritchett's motion to suppress. I disagree with the majority's determination that the investigation was over at the time the backpacks were searched.


{¶ 38} From the time Officer Nasser and others stopped Pritchett and Dorroh, Officer Nasser was in radio communication with his supervisor. He learned that other units were in the area checking nearby ATMs. At approximately seven minutes into the stop, the unit checking the ATMs reported that there was no visible damage to the ATM at the PNC bank that was the subject of the 911 call. However,

dispatch had contacted the 911 caller and at approximately eight minutes into the stop, the dispatcher reported the 911 caller provided more specific information that the ATM was being tampered with by using a tool on the ATM money release section. At approximately nine minutes into the stop, the supervising officer stated that given that new information, officers were to further "double-check" the ATM's. After that, he told the officers with Pritchett and Dorroh to verify they did not have any tools.

{¶ 39} The investigative stop and its purpose were not complete when Officer Nasser's supervisor broadcast to him and his partner to verify they didn't have any tools. Nor was the investigation prolonged by having other officers check the ATMs given more specific information. However, I do find that Pritchett objected to the search of his backpack and at that point in time, the police had no specific evidence that a crime had been committed and thus had no probable cause to search Pritchett's backpack over his objection. As such, the trial court should have granted Pritchett's motion to suppress because there was no probable cause to search his backpack without consent.